[Cite as *State v. Johnson*, 2016-Ohio-7266.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

STATE OF OHIO,                                   :

    Plaintiff-Appellee,                        :            CASE NO.   CA2015-09-086

                                                 :            O P I N I O N
- vs -                                                                 10/11/2016

                                                 :

ROGER JOHNSON,                                   :

    Defendant-Appellant.                       :


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 15CR30860


David P. Fornshell, Warren County Prosecuting Attorney, Kathryn M. Horvath, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Jeffrey W. Stueve, 301 East Silver Street, Lebanon, Ohio 45036, for defendant-appellant


**HENDRICKSON, J.**

{¶ 1}   Defendant-appellant, Roger Johnson, appeals from his conviction in the Warren County Court of Common Pleas for possession of a deadly weapon while under detention. For the reasons set forth below, we affirm appellant's conviction.

{¶ 2}   On February 4, 2015, a fight broke out between inmates at the Warren Correctional Institution ("WCI") in Warren County, Ohio.  Appellant and another inmate, Bryant Adams, attacked and fought with two other inmates, Tyler Breeding and Todd

Vondrak, as the men were returning from lunch. Both appellant and Adams were in possession of homemade weapons during the attack. A laundry bag containing an adapter was found near the area Adams was fighting with Vondrak. About fifteen yards away from this fight, near where appellant and Breeding were fighting, a second laundry bag containing a rock tied inside of a sock was found.

{¶ 3} As a result of the fight, appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2) and one count of possession of a deadly weapon while under disability in violation of R.C. 2923.131(B), both felonies of the second degree. With respect to the latter offense, the indictment specified that appellant was in possession of a deadly weapon while under detention for committing an aggravated felony of the first degree prior to July 1, 1996.

{¶ 4} On April 20, 2015, prior to his arraignment, appellant filed two pro se motions. The first motion sought discovery pursuant to Crim.R. 16 and the second motion requested a speedy trial. After being arraigned, and entering a not guilty plea, appellant filed a motion for "Waiver of Counsel, Criminal Rule 44(C)." In this motion, appellant cited *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975) and *State v. Gibson*, 45 Ohio St.2d 366 (1976) and stated he was "knowingly, intelligently, and voluntarily waiv[ing] his right to counsel." Although he sought to waive counsel, appellant did ask the court to allow counsel for his co-defendant, Adams, to "aide [and] assist" him in his defense by obtaining "documents" that he would not have access to as a result of his incarceration. Appellant then filed a memorandum in which he raised the affirmative defenses of duress and self-defense.

{¶ 5} On May 27, 2015, the trial court held a pretrial and scheduling conference. At this time, the court addressed appellant's motion to waive counsel. The trial court advised appellant that self-representation was "not a good idea" and informed him that he had a right to be represented by an attorney, that a trial is governed by rules, procedure, and evidence

- 2 -

and appellant would be bound by these rules "even though [he] doesn't know what those rules are," and that neither the court nor the prosecutor would be able to help appellant in his representation of himself. Appellant indicated he was familiar with waiving counsel, stating "I've represented myself several times before." The court had appellant read and execute a written waiver of counsel form before finding that appellant's "waiver of counsel was made in a knowing, voluntarily, and intelligent fashion." The court appointed standby counsel, and appellant indicated he would use standby counsel to assist with discovery matters.

{¶ 6} Thereafter, on June 3, 2015, appellant filed a motion to suppress statements he made to Ohio State Highway Patrol Trooper James D. Williams on February 5, 2015, during Williams' investigation into the prison fight. In his memorandum in support, appellant argued Williams' written summation of appellant's statements was false, inaccurate, and nothing more than "fictional grandeur." Appellant also argued statements he made to Williams about killing an inmate in the past should be suppressed as appellant had already been tried and acquitted for that offense and admission of such statements raised a double jeopardy concern. On June15, 2015, the trial court issued an Entry and Order informing the parties that "suppression is not the proper remedy for the subject matter" of appellant's motion and that it would "treat the filing as a Motion in Limine to Exclude Certain Evidence, which [would] be addressed at the next court hearing."

{¶ 7} On July 9, 2015, at the second pretrial hearing, the court heard argument on appellant's motion in limine. The court informed the parties it would listen to the audio recording of the interview and rule on the admissibility of the evidence at the next pretrial. The court then addressed an issue raised by appellant relating to the accuracy and authenticity of a state's exhibit. During discovery, the state had produced a video recording of the February 4, 2015 prison fight. The state had obtained the footage from WCI, and the footage consisted of three different camera angles that had recorded the fight. Appellant

argued that certain events had been "cut out" of the video, and he requested that the "full video" be introduced into evidence. The court advised the parties that it would view the recording and address appellant's concerns at the next pretrial.

{¶ 8} On July 16, 2015, appellant filed a motion to compel all exculpatory evidence, a motion to correct the erroneous indictment, and a motion to suppress video evidence of the alleged assault. In support of his motion to suppress, appellant reiterated his argument that the video was not a "true record" of the fight because the tape had been "splice[d], cut and manipulated." Appellant argued that important footage of inmate Breeding jumping over a table and running towards appellant had been removed from the recording, thereby prejudicing his defense.

{¶ 9} Thereafter, on July 22, 2015, appellant filed a discovery response in which he listed as potential witnesses the names of five employees from the Ohio Department of Rehabilitation and Corrections ("ODRC") and 13 ODRC inmates. Appellant subsequently filed subpoenas and motions to convey these inmates to court for trial. Appellant also filed a subpoena on Corrections Officer ("C.O.") Mengle, the assistant gang coordinator at WCI, in which he asked C.O. Mengle to produce records related to the Aryan Brotherhood prison gang, and conduct reports for a number of inmates he believed were members of this gang.

{¶ 10} Around this time, appellant also filed (1) a "Motion to Quash and Dismiss Indictment [and] Charges with Prejudice," arguing that the indictment failed to identify a weapon, (2) a "Request for * * * Bill of Particulars," (3) a "Motion to Compel" the state to issue a bill of particulars, and (4) a "Motion to Order State to Provide Bill of Particulars Out of Time." The state filed a bill of particulars on August 17, 2015, which specified that the deadly weapon appellant possessed on February 4, 2015, was a "rock inside a bag." On this date, the state also filed a motion to quash the subpoenas issued by appellant to the "thirteen (13) inmates located in various Correctional Institutions throughout the State of Ohio, primarily

due to these subpoenas being redundant in nature and irrelevant to the instant proceedings."

{¶ 11} A status conference was held on August 27, 2015, at which time appellant withdrew his motion to quash and dismiss the indictment and his motion to correct the erroneous indictment. The court was presented with arguments pertaining to appellant's motion in limine to exclude from evidence his statements to Trooper Williams and the state's motion to quash the subpoenas to the 13 inmates. With respect to the state's motion, the state presented a letter that had been intercepted by officials at WCI. This letter was written by appellant to another inmate, Adam Bockerstette. The letter indicated that appellant had a plan to subpoena Bockerstette and James Robinson, an inmate formerly imprisoned at WCI, so that the two men, who were allegedly in a relationship together, could see one another. According to appellant, Robinson had promised appellant that he "could count on both of [them (Bockerstette and Robinson)] to testify to whatever [appellant] needed either of [them] to say" in exchange for arranging the meeting between the two. The letter informed Bockerstette that appellant needed him to be a character witness against one of the corrections officers. At the hearing, appellant admitted to writing the letter, but argued that both Bockerstette and Robinson should be permitted to testify because their testimony was relevant.

{¶ 12} On September 2, 2015, the trial court issued an Entry and Order on Pending Motions, in which the court granted in part and denied in part the state's motion to quash. The court determined that appellant, "with respect to James Robinson and Adam Bockerstette, [was] using the right of compulsory process as a pretext to have fellow inmates transported either to court or transferred between institutions." The court therefore granted the motion to quash with respect to these two witnesses. However, as for the remaining subpoenaed inmates, the court denied the motion after determining appellant "made a prima facie showing of relevance."

{¶ 13}   The court also granted in part and denied in part appellant's motion in limine. The court found that Trooper Williams' written statement summarizing appellant's February 5, 2015 statements was inadmissible as hearsay, not falling within any enumerated exception. However, the court determined that the audio statement itself was admissible.  As for appellant's statement to Williams that he had previously killed another inmate in prison, the court found that appellant "volunteer[ed]" this information, the "Trooper did nothing to elicit this response" and "there is no constitutional violation which warrants exclusion."

{¶ 14}   After the court rendered its decision on appellant's motion in limine, appellant filed a "Supplemental to the Motion to Limine," in which he claimed for the first time that Williams used "deceptive tactics" in order to induce him into giving a statement.  Appellant argued Williams had "plainly and clearly" stated that their conversation would be "off the record."  He contended that Williams' "deliberate elicitation" of his statement made the statement involuntary and therefore inadmissible.

{¶ 15}   Appellant's supplemental motion was considered by the court at its September 16, 2015 hearing.  Also before the court was a "Motion to Quash and/or Limit Subpoena" filed by ODRC on September 15, 2015.  ODRC sought to quash or limit the subpoena served on C.O. Mengle as the subpoena was "overly broad and unduly burdensome" and the records sought by appellant were "confidential by statute * * * and protected from disclosure."

{¶ 16}   On September 17, 2015, the court issued its Entry and Order on Pending Motions. The court denied appellant's supplemental motion in limine, finding that the issues appellant raised with respect to his statement to Williams went to "the weight to be given to the statement, not issues of admissibility."  With respect to ODRC's motion to quash, the court first noted that ODRC and appellant had reached an agreement whereby appellant would be granted the ability to meet with three of his inmate-witnesses (Adams, David McLoughlin, and Marcus Hardy) prior to trial in exchange for appellant limiting the number of

inmate-witnesses that he would call at trial. As for the documents requested by the subpoena, the court ordered C.O. Mengle to appear and to bring the security threat group files of inmates Breeding and Vondrak, "for the sole and limited purpose of using the materials to refresh her recollection." The court noted that "the parties to this action may be permitted to view the [security threat group] files upon further order of the Court, but no copies will be made or provided." The court then held that the documents requested in the remainder of the subpoena duces tecum need not be provided to appellant or brought to trial.

{¶ 17} A two-day jury trial commenced on September 21, 2015. At this time, the state filed a nolle prosequi dismissing the felonious assault charge. To prove the remaining offense of possession of a deadly weapon while under detention, the state presented testimony from a number of corrections officers working at WCI on the date of the fight, including C.O. Laquitta Bush, C.O. Kevin Dunn, Sergeant Travis Caudill, and Investigator Greg Graft, in addition to testimony from Trooper Williams and Dr. Timothy J. Heyd, the physician who treated the inmates injured in the fight. These witnesses were subject to cross-examination by appellant.

{¶ 18} C.O. Bush testified that on February 4, 2015, she observed Adams strike Vondrak on the head with a weapon made out of a laundry bag as the inmates were returning from lunch. Bush saw "prongs" sticking out of the laundry bag Adams possessed, and she was able to later identify this weapon as a laundry bag containing an adapter. While Bush and another corrections officer attempted to separate and subdue Adams and Vondrak, C.O. Bush observed appellant fighting with inmate Breeding. She did not see appellant use a weapon during his fight with Breeding and was unsure of whether appellant or Breeding threw the first punch.

{¶ 19} C.O. Dunn testified that after being radioed about a fight, he responded to the area where appellant and Breeding were fighting. He and another corrections officer were

able to separate appellant and Breeding after using pepper spray. Dunn did not see appellant in possession of a weapon when he separated appellant from Breeding. However, Dunn found a laundry bag containing a rock wrapped in a sock in an area near where appellant's and Breeding's fight took place.

{¶ 20} Sergeant Caudill testified that "within * * * [a] couple of weeks" prior to the February 4, 2015 fight, appellant and Adams had approached him to discuss problems they were having with other inmates. Appellant and Adams told Caudill they felt like "someone * * * might be after them." Neither inmate was willing to disclose the name of the person or people who were "after them" to Caudill. Nonetheless, Caudill offered to move them from their current cellblock into limited privilege housing or to place them under protective custody while an investigation was conducted.[1] Neither inmate wanted to move from their current cells, and both declined Caudill's offer.

{¶ 21} Caudill explained that he was one of officers who separated appellant and Breeding from their fight. Caudill did not see a8ppellant in possession of a weapon when he was restraining him. However, he later viewed a video recording of the fight, and he saw appellant "swing something over his head at an inmate in the block."

{¶ 22} Investigator Craft investigated the fight that took place between appellant and Breeding and the fight between Adams and Vondrak. He testified that he pulled the security footage from the area where the fight occurred and he retained possession of the two weapons that were recovered from the fight until the weapons could be turned over to law enforcement. He explained that one of the weapons, the laundry bag containing the adapter, had been recovered in the area where Adams had struck Vondrak. The other laundry bag containing the rock in a sock had been recovered near appellant, which was "a good twenty

---

1. Caudill explained that an inmate in limited privilege housing is "locked down" for 20 hours a day whereas an inmate in protective custody is placed in segregation and is "locked down" 23 hours a day.

feet difference from Inmate Adams."

{¶ 23} Craft testified three separate cameras had recorded the inmates' fight and the video recordings demonstrated that appellant "utilize[ed] a weapon." Craft stated the video depicted appellant "and in his right hand is what appears to be on the rock [sic], and the laundry style weapon and as the tape plays you'll see him kind of wrap the extra material of the laundry bag around his right hand and then kind of tuck it up underneath his coat in order to conceal it until he utilizes it as a weapon." Craft explained that after Breeding jumped over a table, "[appellant] assaults him with the rock in the laundry bag and then they engage in their scuffle."

{¶ 24} Craft was present when Trooper Williams interviewed appellant, Adams, Breeding, and Vondrak on February 5, 2015. Neither Breeding or Vondrak cooperated with the investigation, which Craft and Williams testified was a fairly common occurrence when dealing with inmates. Appellant executed a waiver of rights form and agreed to talk with Williams and Craft. During this interview, appellant did not deny hitting Breeding in the head with a weapon. In fact, appellant informed Craft and Williams that the "whole incident was the result of his being assaulted the Sunday prior to this incident and this was his way of getting back to those individuals." Appellant described the weapon he had used during the fight as a "brick wrapped in a sock which was in a laundry bag." Both Craft and Williams testified that the item found in the sock inside the laundry bag was a rock, not a brick.

{¶ 25} Williams and Craft also testified that appellant stated he knew the weapon he used could be deadly. Appellant told Williams and Craft that he had used a similar type of weapon before and had killed another inmate. Williams stated appellant indicated his intentions with the weapon he possessed on February 4, 2015, "was just to give [the victim] stitches, that [appellant knew] the weapon could kill somebody because he's killed somebody with the same type of weapon in the past."

{¶ 26} The inmates injured in the February 4, 2015 fight were treated by Dr. Heyd. Heyd testified Breeding had a "full thickness trivalinear laceration with mild bleeding" to his scalp that required six surgical stitches to close. Vondrak also had a laceration to his scalp, consisting of a 3.5 centimeter "linear but jagged laceration" with two other puncture type wounds. Eight surgical stitches were required to close Vondrak's wounds. Appellant had a small laceration to his forehead, which Dr. Heyd treated by using surgical glue.

{¶ 27} After the state presented its case-in-chief, the trial court admitted the state's exhibits consisting of the two weapons recovered after the fight, the video recording of the fight, pictures of Breeding's, Vondrak's, and appellant's injuries, medical exam reports for Breeding and Vondrak, a Constitutional Rights Waiver Form executed by appellant on February 5, 2015, Property Control Forms detailing the two weapons found at WCI, and a certified judgment entry of appellant's 1987 conviction for aggravated robbery arising out of the Montgomery County Court of Common Pleas. Appellant then moved for acquittal pursuant to Crim.R. 29, and his motion was denied by the trial court.

{¶ 28} Following the denial of his Crim.R. 29 motion, appellant asked the court to allow his standby counsel to take over his defense. The court honored appellant's request and defense counsel was permitted to make an opening statement prior to presenting evidence in appellant's defense. In his opening statement, defense counsel indicated that the evidence would demonstrate that appellant did not possess a weapon or, if appellant did possess a weapon, he did so because he was under duress. Appellant testified in his own defense and called three corrections officers and two inmates as witnesses.

{¶ 29} C.O. Joseph Arnold Reffett testified that when a fight broke out between Adams and Vondrak, he secured Adams. He was aware that a secondary fight had occurred between appellant and another inmate, but he was unable to assist or observe the secondary fight as he was busy restraining Adams.

- 10 -

{¶ 30} Sergeant Jeffrey A. Garrison testified that he is the "count officer sergeant" at WCI and is responsible for "cell assignments, making moves, separation, racial separation, that sort of thing." Garrison stated that on February 4, 2015, appellant, Vondrak, Breeding, Adams, and Edward A. Bean, appellant's cellmate, were moved out of their cellblocks into segregation. On February 1, 2015, an inmate named "Doughty" had been moved into segregation.[2]

{¶ 31} David McLoughlin testified he has been in prison for over 30 years. He is currently imprisoned at the Southern Ohio Correctional Facility, but was housed in WCI from 1997 to 2001, and from 2005 to 2006. McLoughlin testified he has known appellant for about 30 years and is a former member of the Aryan Brotherhood gang. McLoughlin explained that there are members of this gang at WCI and at "every other prison." According to McLoughlin, it is "not uncommon" for the Aryan Brotherhood to use force against other inmates. McLoughlin has been attacked by Aryan Brotherhood gang members, and he is aware that appellant has a "history" with the gang as well, which involved an "associate" of appellant's being stabbed and appellant engaging in "fights" with gang members.

{¶ 32} Adams also testified about his experiences with the Aryan Brotherhood in prison. He stated that he and appellant were threatened by Aryan Brotherhood gang members on February 3, 2015, when doing laundry. He claimed three gang members brandished homemade knives and told him and appellant they had 24 hours to leave the unit or they would have to "pay rent." Adams explained that this threat was intended to extort "food, hygiene, [or] anything of material value." Adams claimed he told Lieutenant Evan Chamblin about the threat, but nothing was done and neither he or appellant were moved out

---

2. Inmate "Doughty" is also referred to at trial as "Daughty" and "Daugherty." It is clear from the context of the various witnesses' testimony that this individual is the same person. For consistency, he shall be referred to as "Doughty" throughout this opinion.

of their cellblocks. Therefore, he and appellant decided to act to protect themselves. Adams stated appellant planned to only "use [his] fist[s] or [engage] in hand to hand combat." However, Adams explained, "I had a brick in my laundry bag, I mean a rock of some type of sorts" that was used to strike Vondrak. He denied knowing where the other weapon containing the adapter came from, stating the "only weapon that I had was a brick in a laundry bag and that's the only thing that I've seen." Adams also testified he believed that in addition to himself, appellant, Breeding, and Vondrak, two other inmates — inmates Doughty and Bean — were also fighting on February 4, 2015.

{¶ 33} Lieutenant Chamblin testified that neither Adams or appellant asked to be placed in segregation because they were being threatened. He explained that if he had been told by either inmate that threats had been made against them, he would have "dealt with the situation right then" by "plac[ing] them in handcuffs and escort[ing] them to segregation and then interview[ing] them."

{¶ 34} Appellant testified in narrative form about the fight on February 4, 2015, and the incidents leading up to the fight. He explained that on February 1, 2015, he had been attacked by inmate Doughty, who was "probating" for the Aryan Brotherhood gang. According to appellant, Doughty targeted him because appellant had shared information about the gang's illegal activities with the corrections officers in exchange for having Adams, his friend and lover, moved into a cell near his cell.

{¶ 35} On February 2, 2015, appellant thought people were "looking at [him] strange" and he felt that there might be a "hit" placed on him. He wrote a letter to Investigator Craft and told him he was going to "retaliate for what happened to him." Then, on February 3, 2015, appellant's roommate told him that "a couple of prisoners" approached him and threatened that "something was going to be done to [him, appellant], and Inmate Adams." Later that day, three Aryan Brotherhood members approached appellant and Adams while

they were in the laundry room. The men, who were carrying "homemade shanks," told appellant and Adams that they had "24 hours to get off the compound" or they had to "pay rent." Appellant explained that this meant he and Adams had 24 hours to "get off the prison" or they had to "pay extortion in order to live [i]n that particular prison."

{¶ 36} Appellant, Adams, and Bean met the evening of February 3, 2015, to "discuss what [appellant] felt needed to be done." Appellant claimed he "never touched this rock that everybody is talking about, but [he] basically instructed [Adams] and explained to him what to do with it and how to prepare it and everything." According to appellant, the plan was for Adams to have the weapon made of the "brick or rock in the laundry bag," for Bean to have the weapon made of the adapter, and for appellant to be without a weapon. Appellant stated he did not want a weapon because he "killed an inmate before in prison. * * * But, it wasn't with a rock or anything, it was a weight inside a laundry bag."

{¶ 37} Appellant testified that around 8:00 p.m. on February 3, 2015, he and his cellmate were moved to another cell without explanation. Appellant feared that the move was "by design by the prison gang." At this time, appellant "changed [his] idea about having a weapon." Appellant took a padlock and put it inside a laundry bag that he took with him to lunch on February 4, 2015.

{¶ 38} Appellant testified that as he and the other inmates returned from lunch, the following occurred:

> I took my weapon out and wrapping the laundry bag around my hand and I went behind Inmate Von[d]rak and I hit Inmate Von[d]rak in his back, right below his shoulder blade. And the reason that I chose to hit him in that area is because I specifically did not want to kill him. Because the last time I hit somebody with something in the laundry bag, I killed him.

Appellant claimed he dropped the weapon he had in a garbage can out of view of the cameras that recorded the incident. He stated he then started defending himself after inmate

- 13 -

Breeding jumped over a table and attacked him. He denied having a weapon in his possession at the time he struggled with Breeding.

{¶ 39} With respect to the padlock weapon, appellant stated he felt he needed it "[b]ecause [he] felt that [his] life was in danger." He stated, "I seen what these particular guys [the Aryan Brotherhood] can do. I've seen their handy work before and I didn't want to be a victim, so I felt that the only thing I could do was attack them to get away from the situation." Appellant also explained that he had lied to Trooper Williams in order to protect Adams when he admitted he used a brick wrapped in a sock inside of a laundry bag during the fight.

{¶ 40} As a rebuttal witness, the state called Investigator Craft. Craft testified that other than appellant, Adams, Vondrak, and Breeding, no other inmates were observed fighting after returning from lunch. Craft also testified that Bean was placed in segregation on February 4, 2015, after reporting that he feared for his life. Craft stated Bean was concerned that he would be attacked in retaliation for appellant's actions.

{¶ 41} Following Craft's testimony, the parties had a discussion with the trial court outside the presence of the jury about the jury instructions. Defense counsel requested an instruction that the jury had to find appellant in possession of the specific weapon set forth in the bill of particulars, that being the rock in the bag, in order to find appellant guilty of possession of a deadly weapon while under detention. The court denied this request, stating "I am not going to change the jury instructions to tell the jury which weapon, if any, they have to find [appellant] guilty of or he was in possession of."

{¶ 42} The trial court instructed the jury on the elements of the offense of possession of a deadly weapon under detention as well as the affirmative defense of duress. The jury returned a guilty verdict, and appellant was sentenced to three years in prison. This sentence was run consecutive to appellant's current prison term.

{¶ 43} Appellant timely appealed from his conviction, raising nine assignments of error.

{¶ 44} Assignment of Error No. 1:

{¶ 45} THE TRIAL COURT ERRED BY ACCEPTING THE APPELLANT'S WAIVER OF COUNSEL.

{¶ 46} In his first assignment of error, appellant argues he did not knowingly, intelligently, and voluntarily waive his right to counsel. He maintains his waiver was not valid because the trial court failed to address "the nature of the charges, the possible penalties, or any possible defenses."

{¶ 47} The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to represent himself at trial. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975); *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 89. However, the Constitution requires that any waiver of the right to counsel be knowing, voluntary, and intelligent. *Iowa v. Tovar*, 541 U.S. 77, 87-88, 124 S.Ct. 1379 (2004). To establish an effective waiver of the right to counsel, "the trial court must make sufficient inquiry to determine whether [the] defendant fully understands and intelligently relinquishes that right." *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph two of the syllabus. *See also* Crim.R. 44(A) (providing that a defendant is entitled to counsel, "unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently, and voluntarily waives his right to counsel").

{¶ 48} "[W]hen a criminal defendant elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his * * * right to counsel." *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 39, citing *Gibson* at paragraph two the syllabus. As the Ohio Supreme Court has noted, there is not a

"'prescribed formula or script to be read to a defendant who states that he elects to proceed without counsel.'" *Johnson* at ¶ 101, quoting *Tovar* at 88. Rather, "'[t]he information a defendant must possess in order to make an intelligent election * * * will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.'" *Id.*, quoting *Tovar* at 88. Further, a waiver of the right to counsel should be made "'with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses of the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'" *Gibson* at 377, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723, 68 S.Ct. 316 (1948).

{¶ 49} Therefore, as this court recently clarified in *State v. Edmonds*, 12th Dist. Warren No. CA2014-03-045, 2015-Ohio-2733, ¶ 26, "the sufficiency of the trial court's inquiry will depend on the totality of the circumstances." There is no specific list of information a trial court must convey to a defendant. *Id.* at ¶ 25. As long as the totality of the circumstances demonstrates a defendant had sufficient understanding of the case and the consequences of self-representation, a defendant's waiver of counsel will be found to be knowingly, intelligently, and voluntarily made. *Id.* at ¶ 31. *See also Johnson*, 2006-Ohio-6404, ¶ 105.

{¶ 50} In the present case, the record reflects that appellant filed a motion for waiver of counsel about a month after being indicted. To ensure that appellant truly understood the nature of this waiver, the trial court advised appellant at the May 27, 2015 hearing as follows:

> THE COURT: I want to make sure that you understand Mr. Johnson, that representing yourself is not a good idea. The State of Ohio is represented by an attorney and you have the right to be represented by an attorney as well. The trial, like everything else in life is governed by rules and procedure and evidence. You are bound by those rules, [the prosecutor] is, and I'm bound by those rules as well. The problem that we have in these cases sometimes, is that you're bound by the rules even though you don't know what those rules are. And, there are certain times

where I'm allowed to make allowances for you because you're representing yourself but the rules don't change. And, I've had the opportunity since I've been a Judge to watch somebody representing themselves where they want to get a piece of evidence in front of the jury. I know that there's a very easy way to do that. The prosecutor knows that there's a very easy way to do that, but the defendant doesn't know how to get that piece of evidence in. I'm not allowed to help you with that, nor is the prosecutor obviously. They're on the other side of this. And, generally representing yourself is not a good idea. But, you have the absolute Constitutional right to represent yourself in the case and if you want to exercise that right, I'm not going to do anything to interfere with that, except to tell you that I don't think it's a good idea, do you understand that?

[APPELLANT]: Yes.

THE COURT: Did you have the opportunity to read over the waiver of counsel that * * * [was given to] you prior to us starting court?

[APPELLANT]: No, but I don't need to. I'm very familiar with it. I've represented myself several times before.

THE COURT: Okay. Did you read the waiver of counsel?

[APPELLANT]: No.

* * *

THE COURT: Well, let's go ahead a take a minute to read it over.

{¶ 51} Thereafter, appellant read the Waiver of Counsel form, which again advised appellant that (1) he had the right to be represented by an attorney and one would be provided to him at no cost if he could not afford one, (2) by representing himself, he could be hurting his case, (3) the state would be represented by an experienced attorney, (4) he would be held to the same standards as an attorney, (5) he would be required to follow the rules regarding evidence and procedure and his lack of knowledge of evidentiary and procedural matters would not prevent the court from enforcing those rules; and (6) the court would not assist him if he had difficulty presenting his case. The form also informed appellant that self-

- 17 -

representation is not a license to abuse the dignity of the court, that self-representation "may result in certain issues being waived on appeal," and that he would not be able to appeal on the grounds that his self-representation was not effective.

{¶ 52} After the waiver of counsel form was read at the hearing, appellant indicated to the court he was "already familiar with this." He stated, "I basically had an understanding that I had knowingly and voluntarily waived my right." After being informed by the court that "there are certain things that [he] needed to be made aware of or [the court] couldn't accept [his] waiver of counsel," appellant stated he understood, had read the waiver of counsel, and had signed the form. By signing this form, appellant acknowledged that he did not suffer from any physical or mental disease or disability that would interfere with his ability to represent himself, that he was not under the influence of drugs or alcohol, and that no promises or threats had been made to force him into waiving his right to counsel. He also acknowledged that he understood the nature of the charges against him, the possible defenses, and the possible penalties that accompanied the charges he faced.

{¶ 53} Appellant now argues that his waiver was not valid because the court did not discuss "the nature of the charges, the possible penalties, or any possible defenses" at the May 27, 2015 hearing. However, as set forth above, there is not a list of information or a proscribed formula or script that must be provided to a defendant. *Edmonds*, 2015-Ohio-2733 at ¶ 25; *Johnson*, 2006-Ohio-6404 at ¶ 101. Rather, a defendant must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing.'" *Faretta*, 422 U.S. at 835, quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236 (1942).

{¶ 54} After thoroughly reviewing the record, we find that the totality of the circumstances establishes that the trial court made a sufficient inquiry to determine appellant knowingly, intelligently, and voluntarily waived his right to counsel. Appellant displayed no

confusion about what he wanted or what self-representation meant. *Compare Martin*, 2004-Ohio-5471 (defendant disclaimed any desire to act as his own lawyer but rather wanted to be co-counsel in his own defense). Appellant unequivocally stated he wanted to represent himself and that he has done so "several times before." Appellant was advised of the dangers in self-representation, that a trial is governed by rules, procedure, and evidence, that he is bound by these rules "even though [he] doesn't know what those rules are," and that neither the court nor the prosecutor would be able to help appellant in his representation of himself.

{¶ 55} The record further establishes appellant knew of the nature of the charges against him and of possible defenses to the charges. On May 20, 2015, prior to waiving his right to counsel, appellant filed a memorandum raising the affirmative defenses of duress and self-defense. Appellant also filed motions to exclude certain evidence from being admitted at trial, filed motions seeking exculpatory evidence, and subpoenaed numerous inmates and corrections officers that he believed would be able to assist him in proving his defense of duress. Appellant's actions and the substance of his motions demonstrate his appreciation and understanding of the legal process as it pertained to the charges he faced. *See State v. Glass*, 10th Dist. Franklin No. 10AP-558, 2011-Ohio-6287, ¶ 36-38.

{¶ 56} Although there is nothing in the record demonstrating appellant knew the range of possible penalties he faced, the court's failure to instruct appellant on this issue does not render his waiver of counsel invalid. *Johnson*, 2006-Ohio-6404 at ¶ 81-104. Appellant was advised by the trial court as follows after the state extended a plea bargain on the record at the May 27, 2015 hearing:

> [I]f we are unable to resolve this case by way of a plea, then the case is going to go to trial and at the trial, the State might be able to prove you're guilty of this. They might not. I don't know. In the event that they are able to prove you guilty of this, the one thing that I caution all the defendants about is that the State right now

- 19 -

> is agreeing to a sentence of 18 months in prison to be served consecutive to the time you're already doing and to the reduced charge. *If in fact you're convicted of these offenses, it may be that your sentence is more than that.* It might be that after I have the opportunity to hear the evidence, review your criminal record, that I may not impose that, although there's no statutory requirement that these be served consecutively to one another * * *.

Appellant therefore knew he faced a possible consecutive prison term and that the term could be longer than 18 months.

{¶ 57} Accordingly, under the circumstances of this case, we find that the trial court reasonably determined appellant had sufficient understanding of the case and the consequences of self-representation to make his waiver of counsel voluntary, knowing, and intelligent.

{¶ 58} Appellant's first assignment of error is, therefore, overruled.

{¶ 59} Assignment of Error No. 2:

{¶ 60} THE TRIAL COURT ERRED BY NOT RULING ON THE MOTION TO SUPPRESS THE VIDEO.

{¶ 61} In his second assignment of error, appellant argues the trial court erred in failing to rule on his motion to suppress the video recording of the February 4, 2015 fight. Appellant contends that the video was "the crucial piece of evidence" and "[w]ithout the video tape * * * [he] would have been, not might have been, would have been [sic] acquitted."

{¶ 62} At the July 9, 2015 hearing, appellant raised issues relating to the accuracy and authenticity of the video recording. Appellant argued the state had "cut out * * * [events] pertinent to [his] defense." Specifically, appellant contended the recording had cut out footage of an inmate "jump[ing] over the table * * * [and] coming at [him]." Appellant stated this footage was relevant to his defense, and he wanted the "full video" to be made available. The court advised the parties that it would view the video recording and address appellant's

concerns at the next pretrial.

{¶ 63} On July 16, 2015, prior to the date of the next pretrial, appellant filed a "Motion to Suppress Video of the Allege[d] Assault on Feb. 4, 2015." In his motion, appellant contended the video was "not a true record of what transpired" because the tape had been "splice[d], cut and manipulated." He again contended that footage of inmate Breeding jumping over a table and running towards him had been removed from the recording, thereby prejudicing his defense.

{¶ 64} The trial court did not render a decision on appellant's motion to suppress the video recording prior to trial. "Although it is error for the trial court not to rule on pre-trial motions prior to trial, such error is harmless unless it adversely affects substantial rights of the defendant." *State v. Clark*, 8th Dist. Cuyahoga No. 67305, 1996 WL 38873 (Feb. 1, 1996), *5, citing *State v. Tolbert*, 70 Ohio App.3d 372 (1st Dist.1990). *See also* Crim.R. 12(F).

{¶ 65} In this case, the trial court's failure to rule on the July 16, 2015 motion was not prejudicial to appellant. Appellant's motion did not seek to exclude the video recording on constitutional grounds, but rather sought to ensure that the video recording presented at trial included footage of the inmate jumping over the table and approaching appellant. The video recording introduced at trial did include this footage, and appellant was given the opportunity to cross-examine witnesses about these events.

{¶ 66} Additionally, the video recording was introduced into evidence at trial without objection from appellant. By failing to object, appellant has waived any error except plain error. *State v. Sheldon*, 12th Dist. Brown No. CA2013-12-018, 2014-Ohio-5488, ¶ 30, citing Crim.R. 52(B). "Plain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights or influenced the outcome of the proceeding." *Id.* Notice of plain error is taken with the utmost caution, under exception circumstances, and

only to prevent a manifest miscarriage of justice. *State v. Grisham*, 12th Dist. Warren No. CA2013-12-118, 2014-Ohio-3558, ¶ 38.

{¶ 67} In the present case, we find no error, plain or otherwise, in the admission of the video recording. The recording was properly authenticated at trial and was relevant evidence as it depicted the events that occurred at WCI on February 4, 2015.

{¶ 68} Appellant's second assignment of error is, therefore, overruled.

{¶ 69} Assignment of Error No. 3:

{¶ 70} THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS.

{¶ 71} In his third assignment of error, appellant argues the trial court erred by denying his "Supplemental to the Motion in Limine," in which he argued his statements to Trooper Williams should "be excluded entirely" because Williams used "deceptive tactics" to induce him into giving a statement that was supposed to be "off the record." Appellant also contends the state failed to prove the "voluntariness of [his] statements" to Williams.

{¶ 72} Appellant's "Supplemental to the Motion in Limine" was filed after the trial court denied appellant's motion in limine to exclude his February 5, 2015 statement to Williams. The court's denial of appellant's motion in limine occurred after the court heard argument on the motion at the July 9, 2015 and August 27, 2015 hearings and listened to the audio recording of the February 5, 2015 interview. At no point in time did appellant argue in his original motion in limine or at the July 9, 2015 or August 27, 2015 hearings that his statement had been coerced or that he had given his statement only after being promised it would be off the record. In fact, in his June 3, 2015 memorandum in support of his motion in limine, appellant referred to his statement to Williams as "my voluntary statement of Feb. 5th, 2015." It was only after the trial court held multiple hearings on the motion in limine and denied said motion that appellant raised the issue of an induced statement.

{¶ 73} Appellant was given the opportunity to argue his supplemental motion at the September 16, 2015 hearing. At that time, appellant alleged his conversation with Williams occurred after Williams told him "you don't have to make a statement, we can just talk man to man. This conversation is off the record."

{¶ 74} The state responded to appellant's arguments by stating that "the recording speaks for itself. There was never anything on there indicating that they were not going to talk about certain things or of that nature." The state did admit, however, that "after the recording finished," appellant made additional statements about how he and Adams wanted to "get out of WCI" and "move to Lucasville" together, and that Williams had noted appellant's statements in the police report.

{¶ 75} Under the Fifth Amendment to the United States Constitution, no person shall be compelled in any criminal case to be a witness against himself. To ensure a defendant's Fifth Amendment rights are protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966) have been followed. *State v. Zylko*, 8th Dist. Cuyahoga No. 89949, 2008-Ohio-3032, ¶ 13. *See also State v. Coonrod*, 12th Dist. Fayette No. CA2009-08-013, 2010-Ohio-1102, ¶ 8.

{¶ 76} In the present case, the audio recording of the February 5, 2015 interview demonstrated appellant waived his *Miranda* rights after being advised of such rights by Williams. Although appellant waived his *Miranda* rights, "the question of whether the accused's statements were in fact voluntary is separate from the question of compliance with *Miranda*." *State v. Chase*, 55 Ohio St.2d 237, 246 (1978). *See also State v. Johnson*, 12th Dist. Butler CA2008-06-153, 2009-Ohio-4129, ¶ 25; *State v. Western*, 2d Dist. Montgomery No. 26058, 2015-Ohio-627, ¶ 13 ("Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are

distinct issues"). "The Due Process Clause requires an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 10, citing *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326 (2000).

{¶ 77} "'In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances.'" *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 93, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147 (1978). "Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *State v. Clark*, 38 Ohio St.3d 252, 261 (1998). Under this analysis, a court should consider "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Edwards* at paragraph two of the syllabus.

{¶ 78} Here, appellant contends the "inherently coercive tactic" employed by Williams was the promise that their conversation would be off the record. In support of his argument that Williams' actions made his statement involuntary, appellant relies on *Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir.2003). In *Hopkins*, the Fifth Circuit Court of Appeals found a defendant's confession involuntary where the defendant confessed only after being held in isolation for 15 days, after being interviewed a total of nine times, with the ninth time being by someone the defendant considered a "close friend," and after the "interviewer-friend" assured the defendant their conversation was confidential. *Id.* at 583-585. During the defendant's ninth interview, which was recorded, the defendant's close friend, a police detective from a neighboring state, made statements to the defendant that the talk was just

- 24 -

between the two of them, stating "this is for me and you. This is for me. Okay. This ain't for nobody else" and "you ain't got absolutely nothing to hide from me." *Id.* at 584. The Fifth Circuit determined that the "totality of the circumstances" surrounding appellant's confession to murdering two women was involuntary. *Id.* at 585.

{¶ 79} The circumstances surrounding appellant's statement to Trooper Williams, however, were significantly different than those in *Hopkins* and do not support appellant's contention that his statement was induced by the promise that it would be "off the record." Appellant met with Williams the day after the fight at WCI, and the recorded nature of their conversation was readily apparent. Williams identified both himself and appellant, noted the location where the interview was taking place, and stated the time the interview commenced and ended for purposes of preserving the record.[3] Williams did not indicate during his conversation with appellant that anything he said would be kept between the two of them. In fact, Williams told appellant he was investigating the crime and was trying to understand "why did this happen?"

{¶ 80} Given these circumstances, as well as appellant's familiarity and previous involvement with the police and his admission in his June 3, 2015 memorandum that his statement was "voluntary," we find no error in the trial court's decision to deny appellant's motion. The totality of the circumstances demonstrates appellant's statement to Williams was voluntary.

{¶ 81} In reaching this determination, we recognize that the state admitted appellant made a few statements to Williams after the recording ended. These statements dealt with appellant's desire to move to a different prison institution with Adams.[4] The statements were

---

3. The interview occurred at WCI and lasted approximately nine minutes, from 10:22 a.m. until 10:31 a.m.

4. At the September 16, 2015 hearing, appellant stated that part of his conversation with Williams took place "before and after the recorder was ever on." Appellant did not identify any specific statements made during

- 25 -

given after appellant waived his *Miranda* rights, and there is nothing in the record to suggest these statements were involuntarily made by appellant. Moreover, appellant cannot claim to be prejudiced by the admission of these statements, as these statements were not offered as evidence by the state at trial.[5]

{¶ 82} For the reasons set forth above, we find no error in the trial court's denial of appellant's "Supplemental to the Motion in Limine," and we overrule his third assignment of error.

{¶ 83} Assignment of Error No. 4:

{¶ 84} THE TRIAL COURT ERRED BY NOT ORDERING THE DISCLOSURE OF THE CONDUCT REPORTS.

{¶ 85} In his fourth assignment of error, appellant argues the trial court abused its discretion when it granted in part ODRC's motion to quash the subpoena filed on C.O. Mengle. Specifically, appellant argues the court erred by not requiring Mengle to produce inmate conduct reports as such records were "public records * * * necessary to prove [his] affirmative defense."

{¶ 86} Appellant filed a subpoena duces tecum on Mengle on August 3, 2015, in which he sought to have Mengle bring to trial "certain documents [and] records * * * pertinent to [his] defense." These documents included

1. [A]ny [and] all relevant information (not just limited to the State of Ohio), the history, motivation, content and nature of the Aryan Brotherhood Prison Gang;

---

these time periods. The only statements preserved for our review are the statements dealing with appellant's desire to move to the Lucasville prison with Adams.

5. Neither Trooper Williams nor C.O. Craft testified at trial that appellant wanted to "get out of WCI" and "move to Lucasville" together with Adams. Williams did testify, on cross-examination, that Adams, "your co-defendant, he admitted it as well [that he struck someone] and told me about the plans that you guys had come up together with about getting some revenge and getting transferred out of the prison, so there was no reason to go back and interview anybody else."

2. Does the Gang Coordinator's data base have any and all information relating to the prison behavior and conduct (of the past [and] present) of these listed A/B Gang members: Tommy Graewe * * *, William Vandersommen * * *, James Bowling * * *, John Stojetz * * *, Ed Morgan * * *, [and] Jason Robb;

3. Is these two inmates: Tyler Breeding * * * [and] Todd Vondrak II * * * in your gang file, as members belonging to the Aryan Brotherhood Prison Gang; [and]

4. On July 22, 2015, at WCI, was the Aryan Brotherhood Prison Gang involved in a physical (violent) altercation that resulted in multiple individuals being placed in segregation and Unit 3B being locked down.

ODRC filed a motion to quash and/or limit the subpoena, arguing that the "security threat group * * * records sought to be produced are confidential by statute" and that the subpoena was "overly broad and unduly burdensome."

{¶ 87} At the September 16, 2015 hearing on the motion to quash, appellant attempted to clarify and limit what he was seeking. Appellant stated he was seeking "the gang's motto or creed, what they believed in, who they don't like or what they believe in." He also explained he was seeking conduct reports on "Tommy Groff [sic]" and other inmates. His reasons for wanting these conduct reports were as follows:

> [APPELLANT]: Tommy Groff [sic] is one of the prisoners that's released now and he's No. 214863 and also all these prisoners are prisoners I've actually done time with and this is why it's relevant to this particular case because they are members of the Aryan Brotherhood and I wanted to be able to let the jurors know about this particular gang and their history.
>
> Well, anyway, Tommy Groff [sic], stabbed inmate Curry, a black inmate, Michael Curry, around 1993 or 94, I can't remember exactly what year, 44 times at SOCF, Lucasville, Ohio. I was present at the time. Billy Venesummers [sic] * * * James Bowling * * * and John Stovers [sic] killed a juvenile prisoner at Madison Prison around April of 1996. The prisoner's name was Domico Watson. John Stovers [sic] is presently on death row for this incident. Jason Rowell [sic], * * * was the median in the 1993 Lucasville prison riot. The reason I requested this is because I wanted to demonstrate the volatile history of the prison gang.

- 27 -

Appellant also clarified that in the subpoena, he "was just asking the institution if Inmate Breeding and Inmate Von[d]rak, these are the two victims that was in this incident, are they STG [security threat group] members."

{¶ 88} Counsel for ODRC explained that while conduct reports are public records, ODRC

> only ha[s] electronic conduct reports going forth from 2006, so these things that [appellant's] talking about happened in the 90's you know, I'm not sure where they are, if they're in storage or who knows how long you know they've been separate and apart from these inmate's records, so he would be required to go back and pull these conduct reports, that yes, they're public records, but after ten years they kind of lose their public record characteristics because we're not required to keep all that information. * * * [Further], with regards to [appellant's] statements about specific gang member files, when he's referring to Breeding and Von[d]rak, those actually are confidential by statute. * * *

{¶ 89} After hearing the foregoing, the trial court ordered Mengle to appear at trial and to bring the security threat group files of Breeding and Vondrak "for the sole and limited purpose of using the materials to refresh her recollection" if questioned about Breeding and Vondrak's involvement in the Aryan Brotherhood. However, the court granted ODRC's request to quash the subpoenaed conduct reports.

{¶ 90} "Crim.R. 17(C) confers upon the trial court the discretion to quash or modify a subpoena, on motion of a party, if compliance would be 'unreasonable or oppressive.'" *State v. Widmer*, 12th Dist. Warren No. CA2011-03-027, 2012-Ohio-4342, ¶ 128, quoting *State v. Baker*, 12th Dist. No. Warren No. CA2009-06-079, 2010-Ohio-1289, ¶ 15. An appellate court reviews a trial court's decision on a motion to quash under an abuse-of-discretion standard of review. *Baker* at ¶ 15. An abuse of discretion implies more than an error of law or judgment; it suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 23.

{¶ 91} When deciding a motion to quash a subpoena duces tecum prior to trial, a trial

court must hold an evidentiary hearing. *Baker* at ¶ 21, citing *In re Subpoena Duces Tecum Served Upon Atty. Potts*, 100 Ohio St.3d 97, 2003-Ohio-5234, ¶ 16. At the hearing, the burden rests on the proponent of the subpoena to demonstrate that the subpoena is not unreasonable or oppressive. *Potts* at ¶ 16. The proponent accomplishes this by showing

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id.*, quoting *United States v. Nixon*, 418 U.S. 683, 699-700, 94 S.Ct. 3090 (1974).

{¶ 92} After careful review of the record, we find that the trial court did not abuse its discretion in granting ODRC's motion to quash appellant's subpoena of the conduct reports. Appellant failed to demonstrate that the subpoena was not unreasonable or oppressive as he failed to show that the information sought was relevant and evidentiary. The conduct reports sought by appellant dealt with incidents that occurred over 20 years ago and involved inmates who were not present at WCI on the date of the February 4, 2015 fight. Although appellant was certainly entitled to present evidence about the nature of the Aryan Brotherhood in support of his duress defense, the conduct reports detailing events that occurred over 20 years ago in separate prison institutions were not relevant or material to the present case.

{¶ 93} Appellant's fourth assignment of error is, therefore, overruled.

{¶ 94} Assignment of Error No. 5:

{¶ 95} THE TRIAL COURT ERRED BY GRANTING THE MOTION TO QUASH THE SUBPOENA OF JAMES ROBINSON.

{¶ 96} In his fifth assignment of error, appellant argues his right to compulsory

process was violated when the trial court quashed his subpoena of James Robinson, an inmate formerly imprisoned at WCI. Appellant contends Robinson was an eye witness to the fight and that his testimony was relevant to appellant's defense.

{¶ 97} The right of a criminal defendant to present witnesses on his own behalf in order to establish a defense is a fundamental element of due process. *Taylor v. Illinois*, 484 U.S. 400, 409, 108 S.Ct. 646 (1988); *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 4-5 (1987). However, this right is not without some limitations. *State v. Studer*, 12th Dist. Butler No. CA91-06-101, 1991 WL 247525, *3 (Nov. 25, 1991). Where a defendant's subpoena is challenged, "the defendant must make a 'plausible showing' of how the witness's testimony will be 'both material and favorable to his defense.'" *State v. Smith*, 168 Ohio App.3d 141, 2006-Ohio-3720, ¶ 123 (1st Dist.), quoting *U.S. v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440 (1982). "This showing is essential to establish a constitutional violation." *Id.*

{¶ 98} In the present case, the trial court was presented with a letter written by appellant to inmate Bockerstette. The letter stated, in relevant part, as follows:

> As you probably know by now I'm [appellant] is [sic] getting ready to go to trial * * *. *[Robinson], before he road* [sic] *out, asked me to put you [and] him down as witnesses, basically so you'll* [sic] *could see each other. He said I could count on both of you'll* [sic] *to testify to whatever I needed either of you to say*.
>
> * * *
>
> I'm going to court for a felonious assault [and] deadly weapon. Now I can put [Robinson] in my block during the time of the incident—because he brought the lunch trays down to our block 3D. * * *
>
> But I couldn't come up with a plausible plan to put you in the block during the incident, so I had to figure something else out, if I wanted to make sure you made the trip if [and] when so you could see [Robinson].

(Emphasis added.) Relying on this letter, the state argued that appellant was only seeking to call Robinson and Bockerstette as witnesses as a pretext for getting the two men together.

In response, appellant admitted he "wrote the letter and it's true," but he denied "coaching" the two inmates in what they should say at trial. He then claimed "Robinson was an eye witness. He seen the whole incident."

{¶ 99} Under the facts of this case, we find no error in the trial court's decision to quash appellant's subpoena of Robinson. The trial court had evidence before it demonstrating Robinson would be willing to fabricate testimony and "testify to whatever [appellant] needed * * * [him] to say" in exchange for appellant arranging a meeting between Robinson and Bockerstette. Although appellant argued Robinson was an "eye witness," appellant failed to proffer into the record what he believed Robinson's testimony would be or how such testimony would have impacted his defense. Without this proffer, we cannot say that Robinson's testimony would have been both material and favorable to his defense. *See State v. Tirey*, 12th Dist. Warren No. CA92-06-050, 1992 WL 379308, *4 (Dec. 21, 1992).

{¶ 100} We therefore conclude that the trial court did not err in quashing appellant's subpoena of Robinson, and we overrule his fifth assignment of error.

{¶ 101} Assignment of Error No. 6:

{¶ 102} THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF PRIOR BAD ACTS WITHOUT A LIMITING INSTRUCTION.

{¶ 103} In his sixth assignment of error, appellant argues the trial court's failure to give a limiting instruction after permitting Trooper Williams to testify that appellant "[knew] the weapon could kill somebody because he's killed somebody with the same type of weapon in the past" prejudiced his right to a fair trial. Appellant, however, failed to request a limiting instruction at trial. He has, therefore, waived all but plain error on appeal. *See State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 45; *State v. Shah*, 2d Dist. Montgomery No. 25855, 2014-Ohio-1449, ¶ 39.

{¶ 104} As previously noted, pursuant to Crim.R. 52(B), an alleged error constitutes

plain error only if the error is obvious and but for the error, the outcome would have been different. *Sheldon*, 2014-Ohio-5488 at ¶ 30; *Morgan* at ¶ 45. Here, we find that given the overwhelming evidence of appellant's guilt, the trial court's failure to provide a limiting instruction does not rise to the level of plain error. Although it may have been a better practice for the trial court to provide the jury with a limiting instruction as appellant suggests, we cannot find that the outcome of the trial would have been different. There was overwhelming evidence of appellant's guilt presented at trial as appellant admitted to possessing a weapon and the video recording captured appellant in possession of a deadly weapon while under detention. We therefore find the trial court's failure to provide the jury with a limiting instruction was, at worst, harmless error. *See Morgan* at ¶ 46, quoting *State v. Simms*, 12th Dist. Butler No. CA2007-11-300, 2009-Ohio-550, ¶ 34 ("A finding of harmless error is appropriate where there is 'overwhelming evidence of guilt' or 'some other indicia that the error did not contribute to the conviction'").

{¶ 105} Appellant's sixth assignment of error is, therefore, overruled.

{¶ 106} Assignment of Error No. 7:

{¶ 107} THE TRIAL COURT ERRED BY INSTRUCTING THE JURY THAT THEY COULD MAKE A FINDING OF GUILTY BASED ON POSSESSION OF ANY DEADLY WEAPON.

{¶ 108} In his seventh assignment of error, appellant argues the trial court abused its discretion by failing to instruct the jury that it had to find him in possession of the specific weapon set forth in the bill of particulars, that being the rock inside a bag, in order to convict him of possession of a deadly weapon. He contends it was prejudicial error for the trial court to "expand" the jury instructions beyond the limit set by the bill of particulars and instruct the jury that they could find appellant guilty of possessing "any" weapon.

{¶ 109} Jury instructions are matters which are left to the sound discretion of the trial

court. *State v. Jones*, 12th Dist. Butler No. CA2015-02-020, 2015-Ohio-5029, ¶ 12. "An appellate court may not reverse a conviction in a criminal case based upon jury instructions unless 'it is clear that the jury instructions constituted prejudicial error.'" *Id.*, quoting *State v. Campbell*, 12th Dist. Butler No. CA2009-08-208, 2010-Ohio-1940, ¶ 13. Jury instructions must be reviewed as a whole. *Id.* "[I]f taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled." *Id.*, citing *State v. Shepard*, 10th Dist. Franklin No. 07AP-223, 2007-Ohio-5405, ¶ 7.

{¶ 110} In the present case, the jury was instructed, in relevant part, as follows:

> THE COURT: Now, the defendant is charged with the crime of possession of a deadly weapon while under detention. Before you can find the defendant guilty, you must find beyond a reasonable doubt, that on or about February 4, 2015, and in Warren County, Ohio, the defendant possessed a deadly weapon while under detention at a detention facility. Possess means having control of or over a thing or substance, but may not be inferred solely from your access to the thing or substance, through ownership or occupation of the premises upon which thing or substance is found.
>
> A deadly weapon means an instrument, device or thing capable of inflicting death and designed or specifically adapted for use as a weapon or possessed, carried, or used as a weapon.
>
> Detention means confinement in any public or private facility for custody of persons charged with or convicted of any crime. Detention facility means any place used for confinement of a person charged with or convicted of a crime. If you find the defendant is guilty, you will continue your deliberations and determine if the State proved beyond a reasonable doubt that the defendant was under detention for the commission of an offense, which is an aggravated felony of the first degree committed prior to July 1, 1996. If you find the defendant is not guilty, you do not make this additional finding.
>
> The defendant is asserting an affirmative defense known as duress. The burden of going forward with the evidence of the affirmative defense and the burden of proving are on the defendant. * * *

- 33 -

{¶ 111} After beginning its deliberations, the jury inquired, "does the definition of the possession with a deadly weapon, have to define the deadly weapon as the rock in the sock in the bag, specifically?" Defense counsel objected to the court answering this question, stating, "I think the jury instructions as we discussed previously were sufficient and they can re-read those and they can make that determination on their own." The court, however, thought "the obvious answer to their question is no because the definition of the deadly weapon does not have to be specifically the rock in the sock in the bag. So, it would be a correct statement to say no and I'm going to instruct them in that respect."

{¶ 112} Appellant contends the court's failure to specify that the jury had to find him in possession of the rock inside the bag prejudiced his defense by going outside the parameters set forth in the bill of particulars. He contends he "was never on notice that he was accused of possessing a different weapon."

{¶ 113} Upon a proper request by the defendant, the prosecutor must provide the defendant "with a bill of particulars setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense." Crim.R. 7(E). "The purpose of the bill of particulars is to inform an accused of the exact nature of the charges against him so that he can prepare his defense." *State v. Fowler*, 174 Ohio St. 362, 364 (1963). A defendant's conviction will not be reversed "due to a variance between the bill of particulars and the state's proof, 'unless the defendant is misled or prejudiced by the variance.'" *State v. Lampkin*, 4th Dist. Scioto No. 99CA2635, 1999 WL 1285875, *3 (Dec. 27, 1999), quoting *State v. Kersey*, 124 Ohio App.3d 513, 518 (1st Dist.1997).

{¶ 114} In the present case, appellant was indicted as follows for possession of a deadly weapon while under detention:

> The Grand Jurors, aforesaid, upon their oaths, aforesaid, do further find and present that on or about the 4th day of February, 2015, in the State of Ohio, County of Warren, the defendant,

Roger Johnson, while under detention at a detention facility did knowingly possess a deadly weapon, said offense a Felony of the 2nd degree in that the most serious offense for which the person was under detention is an aggravated felony of the first degree committed prior to July 1, 1996, contrary to and in violation of Section 2923.131(B) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

The bill of particulars filed by the state provided the following:

On or about the time period of February 4, 2015, at Warren Correctional Institution, in Warren County, Ohio, the Defendant, while under detention in a detention facility with the most serious offense for being under detention is an Aggravated Felony of the First Degree committed prior to July 1, 1996, to-wit: Aggravated Robbery committed on or about December 30, 1986, did knowingly possess a deadly weapon, to-wit: rock inside a bag.

{¶ 115} The bill of particulars, therefore, notified appellant of the specific conduct the state was alleging he engaged in and the nature of the offense charged against him. At trial, the state presented evidence in conformity with the events alleged in the indictment. The video recording, along with testimony from the corrections officers and Trooper Williams provided evidence that would allow the jury to determine that appellant, on February 4, 2015 at WCI, was in possession of a rock in a sock inside of a laundry bag. The suggestion that appellant may have possessed a different weapon, a lock inside a laundry bag, was not advanced by the state. Rather, appellant himself raised this issue in his own testimony. The state, therefore, cannot be said to have created a variance between the bill of particulars and its proof. *See Lampkin* at *3.

{¶ 116} Further, the jury instruction provided by the trial court conformed to the evidence presented at trial and was an accurate statement of the law. The jury was properly instructed that appellant could be found guilty of possession of a deadly weapon while under detention only if he was found to possess an "instrument, device or thing capable of inflicting death and designed or specifically adapted for use as a weapon or possessed, carried, or used as a weapon." This instruction is in conformity with the definition of "deadly weapon" as

set forth in R.C. 2923.11(A).[6]

{¶ 117} Accordingly, as the jury instructions fairly and correctly stated the law applicable to the evidence presented at trial, we find no merit to appellant's arguments. The trial court did not abuse its discretion in denying appellant's request to instruct the jury that it had to find appellant in possession of a "rock inside a bag." Appellant's seventh assignment of error is, therefore, overruled.

{¶ 118} Assignment of Error No. 8:

{¶ 119} THE TRIAL COURT ERRED BY ISSUING THE ACCOMPLICE JURY INSTRUCTION.

{¶ 120} In his eighth assignment of error, appellant argues the trial court erred by instructing the jury pursuant to R.C. 2923.03(D). Appellant contends that because Adams did not testify *against* him, the following jury instruction was improper:

> THE COURT: You have heard the testimony of Bryant Adams, another person who pleaded guilty to or was accused in the same crime charged in this case and is said to be in an accomplice [sic]. An accomplice is one who knowingly assists or joins in another in the commission of a crime. Whether Bryant Adams was an accomplice and the weight to be given to his testimony, are matters for you to determine. Testimony of a person who you find to be an accomplice, should be viewed with grave suspicion and weighed with great caution.[7]

The state has conceded that this instruction was not warranted under the facts of this case, but argues the error was harmless.

{¶ 121} As an initial matter, we note that appellant did not object to the trial court providing the foregoing jury instruction. By failing to object, appellant has waived any error

---

6. R.C. 2923.11(A) defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

7. The trial court employed a standard jury instruction for the testimony of an accomplice. *See Ohio Jury Instructions*, CR Section 409.17. Such an instruction has been held to substantially comply with R.C. 2923.03(D). *State v. Tumbleson*, 105 Ohio App.3d 693, 698 (12th Dist.1995).

except plain error. *State v. Underwood*, 3 Ohio St.3d 12, 13 (1983); Crim.R. 30.

{¶ 122} R.C. 2923.03(D) provides as follows:

> If an alleged accomplice of the defendant *testifies against the defendant* in a case in which the *defendant is charged with* complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or *an offense*, the court, when it charges the jury, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

(Emphasis added.)

{¶ 123} "Based on the clear meaning of the statute, R.C. 2923.03(D) only 'contemplate[s] circumstances where the alleged accomplice arranges to, and subsequently does, *testify on behalf of the state against the defendant.*'" (Emphasis sic.) *State v. Feerer*, 12th Dist. Warren No. CA2008-05-064, 2008-Ohio-6766, ¶ 32, quoting *State v. Lancaster*, 9th Dist. Summit No. 14212, 1990 WL 1774, *5 (Jan. 10, 1990). *See also State v. Allen*, 4th Dist. Scioto No. 96CA2421, 1997 WL 691470, *5 (Nov. 7, 1997) ("The trial court was not required to give the [R.C. 2923.03(D)] statutory instruction * * * and furthermore, would have erred in giving it under these circumstances where the testimony of the alleged accomplice was beneficial to defendant/appellant").

{¶ 124} In this case, Adams did not testify *against* appellant. Rather, after being called as a witness by appellant, Adams testified that he had a "brick in [his] laundry bag * * * [or] a rock of some sorts" and appellant was going to "use [his] fist[s] or [engage] in hand to hand combat." Adams was therefore testifying *on behalf* of appellant, and not against him as

contemplated by R.C. 2923.03(D). Under these circumstances, the trial court should not have provided the accomplice jury instruction. *See Feerer* ¶ 32-33; *Lancaster* at *5.

{¶ 125} However, under the facts of this case, we find the court's error does not rise to the level of plain error. As previously stated, "[p]lain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights, or influenced the outcome of the proceeding." *Sheldon*, 2014-Ohio-5488 at ¶ 30. Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *Grisham*, 2014-Ohio-3558 at ¶ 38. Here, appellant cannot demonstrate that the court's erroneous jury instruction influenced the outcome of the proceeding given the overwhelming evidence demonstrating appellant's guilt. *See Morgan*, 2014-Ohio-2472 at ¶ 46. Appellant did not claim to use "hand to hand combat" during the fight. Rather, he admitted to being in possession of a weapon on the date of the fight. Appellant's admission, in combination with the video recording of the fight and testimony from the various corrections officers who were present at WCI on February 5, 2015, provided overwhelming evidence of appellant's guilt. We therefore find no miscarriage of justice in this case. *See Underwood*, 3 Ohio St.3d at 13-14.

{¶ 126} Accordingly, as the trial court's erroneous jury instruction amounted to harmless error, we overrule appellant's eighth assignment of error.

{¶ 127} Assignment of Error No. 9:

{¶ 128} THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION AND THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 129} In his ninth assignment of error, appellant argues his conviction for possession of a deadly weapon while under detention was not supported by sufficient evidence and was against the manifest weight of the evidence. He contends the state failed to prove that he possessed a "rock inside a bag" and, even if he did possess this weapon or

any other weapon, the evidence presented at trial demonstrated he acted under duress.

{¶ 130} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 131} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81, quoting *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in

extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶ 132} Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 133} Appellant was found guilty of possession of a deadly weapon while under detention in violation of R.C. 2923.131(B), which provides that "[n]o person under detention at a detention facility shall possess a deadly weapon." Pursuant to R.C. 2923.131(C)(2)(b)(i), this offense is a felony of the second degree if "[t]he most serious offense for which the person was under detention is a felony of the first degree committed on or after July 1, 1996, or an aggravated felony of the first degree committed prior to July 1, 1996." R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 134} In the present case, appellant does not dispute that he was under detention at a detention facility, or that at the time of his detention, he was serving a prison sentence for a 1987 aggravated robbery conviction. Rather, appellant challenges the state's evidence with respect to whether he possessed a deadly weapon. He contends the state's evidence is "suspect and circumstantial" as "no witness ever testified that they personally saw [a]ppellant with a weapon * * * [and] [a]ppellant was not found with a weapon in his possession."

{¶ 135} As an initial matter, we note that "[a] conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence." *State v. Conley*, 12th Dist. Warren No. CA2013-06-055, 2014-Ohio-1699, ¶ 16. As long as the evidence would

convince the average mind of the defendant's guilt beyond a reasonable doubt, circumstantial evidence is sufficient to sustain a conviction. *Id.*, citing *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 75.

{¶ 136} After reviewing the entire record, weighing inferences, and examining the credibility of witnesses, we find that appellant's conviction was not against the manifest weight of the evidence and was supported by sufficient evidence. The state presented testimony and evidence from which the jury could have found all the elements of possession of a deadly weapon while under detention met. Appellant admitted to possessing a weapon on the date of the fight. There was also video evidence of appellant wrapping a white, cloth-like item around his fist before using this item to strike another inmate. Testimony from various corrections officers indicated that a weapon consisting of a rock in a sock inside of a laundry bag was found near where appellant had engaged in a fight with one of the inmates. Based upon this evidence, we find that appellant's conviction was not against the manifest weight of the evidence and was, therefore, also supported by sufficient evidence. *See Jones*, 2013-Ohio-150 at ¶ 19.

{¶ 137} As for appellant's duress defense, we do not find that the jury clearly lost its way when it concluded appellant had not acted under duress. While duress is a recognized defense to a criminal charge, in order to prevail on this defense, a defendant must prove by a preponderance of the evidence that he was "compelled to commit a crime by another under threat of imminent death or serious bodily injury, and the force compelling the defendant remain[ed] constant, controlling the will of the unwilling defendant during the entire time he * * * commits the act, and is of such a nature that he * * * cannot safely withdraw." *State v. Howard*, 12th Dist. Warren No. CA2012-04-034, 2013-Ohio-1489, ¶ 31, citing *State v. Hall*, 12th Dist. Madison No. CA2007-02-005, 2008-Ohio-1889, ¶ 61-62. *See also State v. Diggs*, 10th Dist. Franklin No. 14AP-18, 2014-Ohio-3340, ¶ 38.

{¶ 138} The jury had testimony from appellant and other inmates about the dangerous nature of the Aryan Brotherhood, the threats levied against Adams and appellant to leave the unit or "pay rent," and appellant's statements that he "felt that [his] life was in danger" and "the only thing [he] could do was attack them to get away from the situation." As the trier of fact, the jury was free to believe all, part, or none of the witnesses' testimony. *State v. Birt*, 12th Dist. Butler No. CA2012-02-031, 2013-Ohio-1379, ¶ 47. The jury was also entitled to weigh the credibility of this evidence against the credibility of the state's evidence that appellant and Adams would have been placed in segregation and removed from their cellblock if either of them had reported being threatened or fearful for their lives. The jury was entitled to find that the threat to "pay rent" did not constitute a threat of imminent death or serious bodily injury as both appellant and Adams testified this expression meant "pay[ing] extortion" or being extorted of "food, hygiene, [or] anything of material value." Further, given the evidence before it, the jury was entitled to reasonably conclude that appellant had not acted out of duress as there was no force compelling appellant to act and appellant could have safely withdrawn himself from the situation.

{¶ 139} Accordingly, we find no merit to appellant's arguments. As appellant's conviction was not against the manifest weight of the evidence and was therefore supported by sufficient evidence, we overrule his ninth assignment of error.

{¶ 140} Judgment affirmed.

S. POWELL, J., concurs.

PIPER, P.J., concurs separately.

**PIPER, P.J., concurring separately.**

{¶ 141} I concur with the majority opinion except as to the first and the eighth assignments of error, wherein I concur in judgment only.

## A. First Assignment of Error

{¶ 142} Regarding the first assignment of error, the totality of the circumstances demonstrate Johnson had experience, not just in representing himself, but also with waiving in open court his right to have legal representation. Johnson's voluntary and informed waiver was evident from his own reference to his waiver. The trial court expressed various concerns in limiting oneself to self-representation when not being trained in the law, while simultaneously ensuring Johnson read and understood the waiver form he signed. Johnson stated, "I, basically had an understanding that I had knowingly and voluntarily waived my right." Johnson further stated he had represented himself several times before and assured the court, "I was already familiar with this," in referencing his waiver of counsel.

{¶ 143} The majority relies upon *State v. Edmonds*, 12th Dist. Warren No. CA2014-03-045, 2015-Ohio-2733, wherein I concurred in judgment only because I found the opinion minimized the overarching significance of an articulate discussion with an individual who desires to represent himself. Clearly, a meaningful inquiry necessitates a focus upon the various dangers in proceeding pro se. In *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph two of the syllabus, the Ohio Supreme Court emphasized the need for specific topics to be discussed and for a "sufficient inquiry" tailored to the individual and case-specific circumstances.

{¶ 144} For example, discussing the potential maximum punishments an individual may receive if convicted would cause many to think twice before proceeding pro se, out of concern for the consequences, if not successful. For this reason, the *Gibson* court directed that potential sentences should be explored with the pro se litigant so he or she realizes the seriousness and gravity of proceeding without the assistance of legal training. There is good

reason Judge Ringland suggested in his concurring opinion in *Edmonds* that "a recitation of the *Doyle* factors also may be the better practice of the trial court." *Edmonds* at ¶ 53.

{¶ 145} In *Doyle*, we revisited the topics to be considered during a waiver colloquy in an effort to make it easy for a trial court to create a checklist of comprehensive topics necessary to explore and ensure a proper waiver of one's right to counsel. *State v. Doyle*, 12th Dist. Brown No. CA2005-11-020, 2006-Ohio-5373. This is because the Ohio Supreme Court has made discussions with potential pro se litigants an affirmative duty. "To discharge this duty in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long as and as thoroughly as the circumstances of the case before him demand." *Gibson* at 377.

{¶ 146} As prescribed in Crim. R. 44(A) an individual must be "fully advised" before he or she can waive the right to counsel. This is a significant affirmative duty suggested by the Ohio Supreme Court in *Gibson*. The dialogue to take place should bring forward "'an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses of the charges in mitigation thereof, and all other facts essential to a broad understanding of the matter.'" *Gibson* at 377, quoting *Van Moltke v. Gillies*, 332 U.S. 708, 723, 68 S. Ct. 316 (1948).

{¶ 147} Absent a dialogue responsive to Crim. R. 44(A) and *Gibson*, a written waiver alone is insufficient to establish a knowing, intelligent, and voluntary waiver of the right to counsel. *State v. Albert*, 2d Dist. Montgomery No. 23148, 2010-Ohio-110; *see also State v. Combs*, 12th Dist. Clermont No. CA2011-01-001, 2012-Ohio-682. A written waiver alone does not fulfill a trial court's affirmative responsibility in this matter and neither does appointing standby counsel.

{¶ 148} Appointing standby counsel is laudable and is certainly done in the interests of justice. However, it does not cure a trial court's failure to "fully advise" or otherwise have a

specific exchange regarding the potential pitfalls of self-representation. *State v. Richards*, 8th Dist. Cuyahoga. No. 78457, 2001 WL 1134880 (Sept. 20, 2001). The failure to inform an individual prior to his or her waiver of counsel is not remedied by the appointment of standby counsel. *State v. Bizzell*, 12th Dist. Clinton No. CA2006-04-015, 2007-Ohio-2160, ¶20.

**{¶ 149}** Here, it is worth noting that in considering the totality of the circumstances, Johnson verbalized an intention to work with standby counsel for specific assistance in his pro se representation. The willingness to use standby counsel, not the appointment itself, reveals the deliberation in Johnson's decision-making and gives credence to his experience and planned intent to represent himself.

**{¶ 150}** Therefore, Judge Ringland's concurring opinion in *Edmonds* remains relevant in that the factors expressed in *Doyle* help to develop the "depth" of discussion and demonstrate the "sufficient inquiry" necessary before a waiver is knowingly, intelligently, and voluntarily given. Any discussion of these factors, in turn, lends itself to the protection of an individual's due process rights as well as the totality of the circumstances upon review.

### B. Eighth Assignment of Error

**{¶ 151}** While the majority finds the trial court erred in giving the accomplice jury instruction, I find the trial court was reasonable in giving such an instruction, when faced with unique circumstances, and therefore committed no error.

**{¶ 152}** Determining whether a jury instruction is relevant rests within the sound discretion of the trial court. *State v. Brannon*, 12th Dist. Clinton No. CA2014-09-012, 2015-Ohio-1488, ¶ 20. When considering the appropriateness of a jury instruction, a reviewing court must examine the instruction as a whole, and should not reverse unless the trial court abused its discretion. *State v. Partin*, 12th Dist. Butler No. CA2012-09-189, 2013-Ohio-2858, ¶ 32. "Requiring a trial court to rigidly apply jury instructions removes the discretion necessary for the flexibility to manage the various situations that arise within criminal jury

trials." *State v. Martens*, 90 Ohio App.3d 338, 343 (3d Dist.1993).

{¶ 153} The majority opinion is correct that R.C.2923.03(D) requires, in an abundance of caution, that when a co-defendant or an accomplice "turns" on his or her fellow co-defendant or accomplice, the jury should be told to carefully weigh such testimony. This is because such testimony may have bias, prejudice, or a hidden agenda. Yet, the majority fails to acknowledge that such bias, prejudice, or hidden agenda might exist regardless of who actually calls the co-defendant or accomplice to the stand. The trial court observes a witness' behavior and demeanor in the courtroom, hears firsthand the testimony and how it is delivered, and is in the best position to judge a witness' credibility. *State v. Shavers*, 12th Dist. Butler No. 2015-12-212, 2016-Ohio-5561, ¶ 14.

{¶ 154} While separate from a situation contemplated by R.C. 2923.03(D), the trial court determined the situation ran parallel to that contemplated by R.C. 2923.03(D). Other than when there is an abuse of discretion, there is no rationale offered for denying a trial court the discretion to give a jury instruction appropriate for the facts.

{¶ 155} Adams was charged in the same incident as Johnson and had entered a plea with his sentence already established at the time he gave testimony. From Adams' participation with Johnson in the criminal attack, the jury could reasonably infer that Adams and Johnson would go to great lengths to help one another. This type of commitment cannot be easily overlooked.

{¶ 156} Also casting shadows upon Adams' testimony is that he and Johnson were incarcerated at the same facility where other criminal associates would have access to Adams. Prison confinement lends itself to an environment particularly conducive to reprisal as well as the ability to create conspired testimony. The trial court was already aware of one situation where Johnson had a fellow inmate attempting to assist Johnson in arranging other inmates to "testify to whatever I (Johnson) needed either of you to say." We refer to this

matter in affirming the trial court in the fifth assignment of error.

{¶ 157} Furthermore, and because Adams had already pled and had been sentenced in the same incident, there was little motivation for Adams not to accept a larger role in the crime than what actually took place or to otherwise "spin" certain facts favorable to his trusted friend and partner-in-crime. Those involved in the judicial system, including trial judges, possess common knowledge that it is extremely dangerous to return to prison if an inmate testifies against a fellow inmate. A jury instruction to aid the jury during its deliberations would not appear arbitrary, capricious, or unreasonable.

{¶ 158} It is entirely reasonable with the unique circumstances faced by the trial court to believe that Adams may have a hidden agenda, or improper motive, or may otherwise give "shaded" testimony on behalf of his co-defendant. Nowhere in the record does it say the trial court gave its instruction strictly pursuant to R.C. 2923.03(D). Rather, the trial court gave the instruction because it appeared to fit the facts of the case.

{¶ 159} Similarly, there was no objection to the instruction because it appeared cogent due to the circumstances. Under these unique facts, Adams might realistically possess improper motive in testifying and suggesting scrutiny of his testimony was proper and not an abuse of discretion. The fact this scrutiny is instructed by the manner of wording found in R.C. 2923.03(D) should be of no consequence.

{¶ 160} To the extent our precedent of *State v. Feerer*, 12th Dist. Warren No. CA2008-05-064, 2008-Ohio-6766, stands for the proposition that a trial court can never give an instruction dealing with an accomplice testifying favorably for a co-defendant, such precedent should be overruled. *Feerer* simply offers no compelling rationale. As the majority opinion does here, *Feerer* finds error merely because the trial court used the same wording as found in R.C. 2923.03(D) and due to the testimony being favorable to the defendant and not against the defendant.

- 47 -

{¶ 161} *Feerer* gives no reason as to why an instruction is never permissible when the co-defendant offers testimony favorable to a defendant. No case law suggests that the same concerns covered by R.C. 2923.03(D) are never valid concerns in different situations. Additionally, R.C. 2923.03(D) does not prohibit, or exclude, a trial court from using the wording in other situations if appropriate.

{¶ 162} "What is sauce for the goose is sauce for the gander" is an expression originally applicable to situations suggesting that gender should not be differentiated. However, words can have more than one situation to which they are applicable, and the saying can also suggest that if one person is allowed to do something, then another person must be allowed to do the same thing. It appears to me that *sometimes* what serves justice for the defendant, may on occasion also serve justice for the state. The trial court's instruction did not shift the state's burden of proof, nor alter any principles of fundamental fairness. When there is no infraction of a significant legal concept, the trial court should not be penalized for maintaining a level playing field.

{¶ 163} A trial court's trade includes the art of crafting jury instructions considerate of the facts. This may, on occasion, also require consideration of the individual testifying and his or her relationship to others, as well as the additional facts present. The majority finds the trial court's instruction was harmless error, presumably because the trial court's instruction did not deprive the jury of its role in deciding what weight to be given the testimony. I, however, would not limit the trial court's ability to craft its jury instructions when the instructions are particular to the facts. Therefore, I would find no abuse of discretion, and no error committed.

### Conclusion

{¶ 164} My reasons and analysis for reaching the same judgment in the first assignment of error is different from the majority view point, thus I concur in judgment only.

Likewise, my review of the eighth assignment of error leads me to a different legal conclusion than the majority because, in my opinion, the trial court committed no error, harmless or otherwise. Therefore, respectfully, I write separately on these two assignments of error and concur with the majority opinion in all other regards.