**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 01-11385

_____

BOBBY RAY HOPKINS,

Petitioner-Appellant,

VERSUS

JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, INSTITUTIONAL DIVISION,

Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

March 20, 2003

Before JOLLY, DeMOSS, and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

Petitioner, Bobby Ray Hopkins, is currently confined on death row pursuant to a conviction of capital murder on May 25, 1994. After exhausting his state direct appeal and habeas corpus remedies, petitioner initiated a federal habeas corpus proceeding under 28 U.S.C. § 2254, which was filed on June 17, 1999, after the effective date of AEDPA. On September 28, 2001, the district court entered judgment denying habeas relief.

Hopkins asked this Court to grant a COA, raising three

Constitutional issues.  This Court granted Hopkins' application for a COA on all three issues.

BACKGROUND

On July 31, 1993, in the early evening, the bodies of 18-year-old Sandi Marbut and her 19-year-old cousin Jennifer Weston were discovered by Marbut's parents.  According to Marbut's father, the girls' bodies were found in their apartment, which was across the street from Marbut's parents' house.

On the evening of July 30, 1993, Marbut and Weston had some friends over at their apartment, and Marbut drove the last guest home about 4:00 a.m. the next morning.  It was alleged that between 4:00 and 5:00 a.m., Bobby Ray Hopkins entered the apartment and attacked Marbut, who was in the downstairs living room sleeping on the couch, stabbing and cutting her approximately 40 times.

Weston came downstairs while Hopkins was attacking Marbut.  Hopkins saw Weston and proceeded to attack her at the foot of the stairway.  Weston apparently tried to flee upstairs but was overpowered.  She died at the landing at the top of the stairs after suffering 66 stab wounds.

According to the police, Hopkins began to search the bedrooms for money.  Hopkins entered the bathroom and tried to clean the blood off his body.  He took some towels to try to stop the bleeding from his wounds.  He then walked down the stairs and exited the apartment.  Later that evening, Marbut's father found

2

her on the living room floor and discovered Weston at the top of the stairs.

Texas Ranger George Turner testified that on the evening the bodies were found, July 31st, he questioned several bystanders at the scene outside the apartment and, as a result, went in search of Hopkins. Apparently, Hopkins had been in the girls' apartment approximately two weeks before the murders. Hopkins was there with two other men and got in an argument with Marbut over money that was missing from her purse. Marbut thought Hopkins had taken the money and asked him to leave and not come back.

Ranger Turner interviewed Hopkins on July 31st, and noticed that Hopkins had cuts on his hands and arms. Turner also noticed what appeared to be blood on Hopkins' boots. Hopkins allowed Turner to take the boots. Subsequent tests showed the blood on the boots was consistent with the blood of Weston, Marbut and Hopkins.

On August 5, 1993, the police searched the area around the apartment and found two blood stained towels in a culvert between the girls' apartment and the house where Hopkins lived with his parents. The towels belonged to the girls and were given to them by Marbut's parents. The blood on the towels was consistent with the blood of Hopkins. Blood on hairs found on the towels was consistent with the blood types of Marbut, Weston and Hopkins. On August 22, 1993, a knife was discovered in the weeds outside the apartment on a route between the girls' apartment and Hopkins' home. The blood on the knife was consistent with the blood of

3

Hopkins, Marbut and Weston.

Serology testing of the blood stains in the apartment indicated that the blood was consistent with Hopkins' blood. His blood was located in numerous areas in the apartment, including on a light switch plate in the living room, the living room wall, a sock, a bathroom rug and faucet, a shoe and a magazine in Weston's bedroom, a newspaper article in Weston's purse, the top of the stairway landing, and one drawer of a chest in Marbut's bedroom. DNA testing of Hopkins' blood indicated that it was consistent with the blood found on various items throughout the apartment. Further, Hopkins' boot matched the footprint of a boot left in the blood on the carpet in Weston's bedroom.

In the weeks following the discovery of the bodies, while the State was developing the above evidence, Hopkins was held in isolation. Hopkins was held after being arrested pursuant to a felony probation revocation warrant alleging non-reporting and non-payment. Apparently, it is unusual to hold such a violator in isolation. After fifteen days in isolation and eight interrogations by law enforcement officers (none of which resulted in a confession), the State called in Detective Tony Knott from New Mexico to just "talk" to Hopkins.

Hopkins considered Knott a friend and apparently the two have known each other for quite some time. Knott and Hopkins were taken to a small room on August 19, 1993, which Hopkins alleges was under the guise of letting the two of them "catch-up on old times."

4

Prior to speaking, Knott claims to have read Hopkins his *Miranda* rights, though Hopkins claims not to remember this and the reading was not taped as required by Texas law.[1]  During this talk, Knott made many statements to Hopkins indicating that he wanted Hopkins to tell him about the murders and that the talk was just between the two of them.  During the course of this four-hour talk, Hopkins made incriminating statements, and Hopkins gave a videotaped interview to Knott.  In this interview Hopkins stated that he went over to Marbut's and Weston's apartment around 4:00 or 5:00 a.m. He and Marbut began to argue, Marbut got a knife, a struggle ensued, and he ultimately stabbed her.  Hopkins admitted that he was cut during the altercation and bled in the apartment.

On May 13 and 14, 1994, the trial court held a *Jackson v. Denno* hearing to determine whether the confession should be admitted.  The court found, amongst other things, that: Knott had given Hopkins the required warnings before both the first and second tapes of the interview and that Hopkins voluntarily waived those rights; Hopkins did not request an attorney prior to or during his confession; and, under the totality of the circumstances, the statement was voluntary.  The trial court also determined that Hopkins desired to terminate the interview on page

---

[1]Hopkins later claimed that it wasn't until the beginning of a second tape that he was read these warnings, but he also later indicated that he was aware of the consequences of speaking to Knott.

203 of the transcribed statement, and ruled that any subsequent statement was inadmissible. A jury trial was subsequently held and Hopkins was found guilty.

Hopkins challenged the admissibility of his confession on direct appeal. The Texas Court of Criminal Appeals found that the trial court did err in admitting the first tape because the *Miranda* warnings were not on the tape as required by Texas law. However, the court found that this error was harmless because the references Hopkins made to the crime on the first tape would only raise issues of self-defense or temporary insanity and were presented or directly inferred through other evidence presented. Also, the court found that the record supported the trial court's findings that Hopkins voluntarily waived his rights on the second tape and that Hopkins' confession was neither coerced not involuntary.

Hopkins then brought this habeas action, which was filed on June 17, 1999, after the effective date of AEDPA. On September 28, 2001, the district court entered judgment denying habeas relief. Hopkins timely filed a notice of appeal, but on November 5, 2001, the district court denied Hopkins a COA. Hopkins then asked this Court to grant his application for a COA.

This Court granted Hopkins a COA on all three issues raised:
1. Whether his Fifth and Fourteenth Amendment rights to remain silent were violated by a law enforcement officer repeatedly coercing and lying to him;

6

2.   Whether his Fifth and Fourteenth Amendment Due Process rights were violated when incriminating statements were obtained from him involuntarily; and

3.   Whether his trial counsel was ineffective in representing him in violation of the Sixth Amendment.

**DISCUSSION**

Were Hopkins' Fifth and Fourteenth Amendment rights to remain silent violated?

Hopkins claims that Knott's conduct violated his Fifth Amendment right to remain silent in that Knott procured a confession from Hopkins involuntarily. Though Hopkins also claims that Knott's conduct violated his due process rights, this is really a restatement of his Fifth Amendment claim, and claims that are covered by such specific constitutional provisions must be analyzed under the standard appropriate to that specific provision and not under the rubric of substantive due process. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

This Court reviews a district court's findings of fact for clear error and its conclusions of law are reviewed *de novo*. *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). Furthermore, under AEDPA, an application of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

7

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). With regard to questions of fact, § 2254(e)(1) requires federal courts to presume that the factual findings of the state courts are correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Essentially, Hopkins alleges that his confession was involuntarily made because he was deceived and coerced by Knott. He points to many instances in the record where it is clear that Knott was trying to use his relationship with Hopkins to get him to talk.[2] He also points out that he was placed in solitary for fifteen days, without being charged with the murder, and was questioned eight different times before Knott was called in. He also argues that, assuming his *Miranda* rights were read to him, that he still was deceived by Knotts' assertions to him, likening

---

[2]Hopkins also indicates, though never argues, that he was trying to invoke his right to remain silent when he told Knott he did not want to talk about the murder, but apparently Hopkins was willing to continue to talk about other topics. Also, Hopkins never explicitly invoked his right to remain silent, and, in light of this Court's recent decision in *Soffar v. Cockrell*, 300 F.3d 588 (5th Cir. 2002), it is doubtful that such an argument would warrant much merit even if raised.

his case to **Spano v. New York**, 360 U.S. 315 (1959).[3]

There are two inquiries to determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. **Moran v. Burbine**, 475 U.S. 412, 421 (1986); **Soffar**, 300 F.3d at 592. First, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion, or deception. **Moran**, 475 U.S. at 421. Second, the relinquishment must be made with a full awareness of the nature of the right being waived. **Id.** A trial court does not err in admitting a defendant's confession into evidence if the defendant ambiguously asserted his right to remain silent nor does a police officer violate that right when he attempts to clarify whether a defendant wishes to remain silent and that defendant chooses to continue to speak about the offense. **Barnes v. Johnson**, 160 F.3d 218, 224-25 (5th Cir. 1998). Also, the Supreme Court has held that the admission of an involuntary confession is trial error subject to a harmless error analysis. **Arizona v. Fulminante**, 499 U.S. 279, 310 (1991). In order to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the jury's verdict. **Brecht v. Abrahamson**, 507 U.S. 619, 637 (1993). Therefore, even if this Court were to find that

---

[3]As to this point, it is also worth noting that Knott admitted in the pre-trial hearing and in his trial testimony that he lied to Hopkins at times during the confession.

9

Hopkins' Fifth Amendment rights were violated, this Court must also find that admission of the confession was not harmless in determining the jury's verdict.

If not for the overwhelming amount of evidence presented to the jury indicating Hopkins' guilt, we might be persuaded by Hopkins' argument. Hopkins argues that his confession was the result of deception and coercion on the part of the police and Knott. In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant. *Colorado v. Connelly*, 479 U.S. 157, 163-65 (1986). The Supreme Court has stated that "[a]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda v. Arizona*, 384 U.S. 436, 476 (1966). In *Spano*, the Supreme Court held that a confession that was obtained after many hours of constant interrogation, at a very early hour, violated the defendant's Fourteenth Amendment rights. 360 U.S. at 321-23. The *Spano* Court considered the totality of the circumstances to reach this conclusion, including the fact that Spano had requested, but been refused, an attorney, and that the police brought in an old friend to deceive Spano and to help get him to talk. *Id.* at 232. However, this Court recently held that trickery or deceit is only

prohibited to the extent that it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. *Soffar*, 300 F.3d at 596. "Neither mere emotionalism and confusion, nor mere trickery will alone necessarily invalidate a confession." *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992) (internal quotations and citation omitted).

It is clear from the context of the confession itself and its surrounding circumstances that Knott's conduct went beyond mere emotionalism, trickery or confusion and passed the line into the sort of lying that deprives a defendant "of the knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424 (1986). During the first taped confession, Knott assured Hopkins that their conversation was confidential telling Hopkins, "This is for me and you. This is for me. Okay. This ain't for nobody else."[4] This assurance came after Hopkins indicated to Knott that he didn't want to talk too loudly for fear that the officers outside of the room might hear them discussing the murder. Knott also reassured Hopkins throughout the confession that they were "friends" and that he just wanted to know the truth. During the interview, Knott also assured Hopkins that he would not tell

---

[4]State's Exhibit 213, p. 56. Later in the interview, Knott also told Hopkins that "you ain't got absolutely nothing to hide from me." *Id.* at 77.

11

Hopkins' mother about details of the murder or Hopkins' confession. After obtaining the confession from Hopkins, however, Knott informed Hopkins that if he was subpoenaed, he would have to tell the truth about their conversation because Knott's family depended on him to bring home a paycheck.

These comments as well as the circumstances under which Hopkins was interviewed, i.e., after being in isolation for fifteen days, being interviewed eight previous times, being interviewed a ninth time by someone Hopkins considered a "close friend," leads to a very *Spano*-like situation. The totality of the circumstances, especially in light of Knott's comments to Hopkins that their conversation was confidential, leads this Court to believe that portions of the Hopkins' admitted confession were indeed involuntary. An officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant. Yet Knott and the prosecution did exactly that.

However, as we stated above, even if this Court were to exclude those portions of the confession that were obtained involuntarily, Hopkins' conviction must be affirmed if the error was harmless. *Fulminante*, 499 U.S. at 310. In order to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the jury's verdict.

12

*Brecht*, 507 U.S. at 637.  In light of the overwhelming amount of circumstantial evidence present in this case, we hold that any error in admitting Hopkins' confession was harmless.  The jury was presented with evidence that blood consistent with the victims' blood was found on Hopkins' boots.  Further, Hopkins' boot matched the footprint of a boot left in the blood on the carpet in Weston's bedroom.  Blood consistent with Hopkins' blood was also found throughout the victims' apartment.  Numerous DNA tests of the blood also indicated that it was Hopkins' blood in the apartment.  Also, when Hopkins was interviewed the day after the murders, he had noticeable cuts on his hands and arms.  In addition, police found two blood stained towels, belonging to the victims, in a culvert between the victims' apartment and the house where Hopkins lived with his parents.  The blood on the towels was consistent with the blood of Hopkins and the victims.  Finally, there also was evidence that Hopkins had been in an argument over money with the victims two weeks earlier.

At trial, the state relied heavily on this other circumstantial evidence rather than relying solely on the confession.  The Hopkins' confession was barely mentioned in the opening argument, and though the taped confession was admitted as evidence, a majority of the trial was taken up by expert testimony as to the reliability of the DNA evidence as well as presenting the other circumstantial evidence mentioned above.  In the closing

13

arguments, the state once again briefly mentioned the confession, but the thrust of its argument was on the other circumstantial evidence.[5]

In light of the overwhelming amount of circumstantial evidence present in this case, as well as the state's limited reliance on the confession at trial, we hold that any error in admitting Hopkins' confession was harmless.

## Was Hopkins' trial counsel ineffective in representing him in violation of the Sixth Amendment?

Hopkins contends that he received ineffective assistance of counsel during the punishment phase of the trial because his counsel failed to present evidence that Hopkins was functioning at a below average intelligence level, received a serious head injury as a child, and had abused alcohol and drugs.

Under the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Hopkins must show that his counsel's assistance was deficient and that the deficiency prejudiced him. In evaluating the first prong, judicial scrutiny of counsel's performance must be highly deferential, and courts

---

[5]The prosecution's reluctance to use the confession too aggressively may have stemmed from the fact that Hopkins stated that he went over to the victims' apartment that night to continue an ongoing affair he was having with Marbut and that she attacked him first when he told her that his girlfriend was returning to town. If believed, this evidence may have had some sort of a mitigating effect on the jury. In fact, the prosecution warned the jury in its opening statement not to trust everything in the confession.

must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. Hopkins must demonstrate prejudice by showing that his attorney's errors were so serious that they rendered the proceedings unfair or the result unreliable. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). This Court has held that a tactical decision not to pursue and present potential mitigating evidence on the ground that it is double-edged in nature is objectively reasonable. *Kitchens v. Johnson*, 190 F.3d 698, 703-04 (5th Cir. 1999).

After reviewing the record and the parties' briefs, we conclude that Hopkins' counsel did look into the possibility of presenting the evidence Hopkins' claims should have been presented, but concluded that the evidence was weak and double-edged in nature. Hopkins' counsel had doctors examine him for head injuries but found nothing conclusive or compelling. As for the alcohol and drug abuse, this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present "double edged" evidence where counsel has made an informed decision not to present it. *Boyle v. Johnson*, 93 F.3d 180, 187-88 (5th Cir. 1996); *Kitchen*, 190 F.3d at 702. We therefore conclude that the district court's decision should be affirmed.

## CONCLUSION

Having carefully reviewed the parties' respective briefs and

15

the record, we hold that the district court did not err in denying Hopkins habeas relief.  Though we are troubled by the state's methods by which it obtained Hopkins' confession, ultimately, we conclude that its admission was harmless in light of the overwhelming amount of circumstantial evidence presented to the jury and the state's limited reliance on the confession.  We also are unpersuaded by Hopkins' contention that his counsel was ineffective.  Hopkins' counsel was operating under an objectively reasonable trial strategy in selecting the type of mitigating evidence that was presented.  We therefore AFFIRM the district court's decision.

**AFFIRMED.**