# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Respondent**

**vs) No. 15-0087** (Kanawha County 13-F-707)

**Tyquan Livermon,**
**Petitioner**

**FILED**

**November 17, 2016**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Tyquan Livermon, by counsel C. Joan Parker, appeals the order of the Circuit Court of Kanawha County, entered on May 19, 2014, convicting him of one count of first degree robbery and five counts of wanton endangerment. The State of West Virginia, by counsel Benjamin F. Yancey, III, filed a response arguing that the circuit court's order should be affirmed.

Upon consideration of the standard of review, the parties' briefs, the record presented, and the oral arguments, this Court finds no substantial question of law and no prejudicial error in this case. Thus, we find that a memorandum decision is the appropriate disposition for this case under Rule 21 of the Revised Rules of Appellate Procedure.

### I. Factual and Procedural Background

On the evening of August 8, 2013, Melissa Coffman was at home in her apartment in the Southmoor apartment complex with Jason Rencher and her two young children. At about 9:30 p.m., while the children slept upstairs, a man with a rifle entered the home and ordered Ms. Coffman and Mr. Rencher to the floor, firing a shot from the rifle into the wall. The gunman threatened Ms. Coffman and Mr. Rencher, demanded money, and took $215 from Ms. Coffman's purse and marijuana from Ms. Coffman and Mr. Rencher. The gunman then left the apartment. Ms. Coffman and Mr. Rencher observed that the gunman was wearing a mask and gray sweatpants and that he carried a backpack.

Ms. Coffman's neighbor heard the gunshot and shouting and alerted law enforcement. Officers responded quickly and were outside of Ms. Coffman's apartment when the gunman fled on foot. The officers gave chase, ordering the man to stop. The gunman fired on the officers, forcing the officers to take cover. After the gunman escaped, the officers set up a perimeter around Ms. Coffman's apartment in which they

1

conducted a sweep for evidence connected to the robbery. During the investigation, the officers found, among other things, rifle shell casings and a backpack containing a mobile phone. On the phone, the officers discovered a video depicting another resident of the Southmoor apartment complex, Shabazz Washington.

Shabazz Washington lived with his sister, Ashley Washington Lowry, and a family friend, Dana Griffith. The police obtained a warrant to search their home, executing the warrant at approximately 6:30 p.m. on August 9, 2013. In the home, the officers discovered an SKS rifle in one of the unit's closets. The rifle was compatible with the shell casings discovered near Ms. Coffman's apartment. The officers also observed Petitioner Tyquan Livermon, a guest in the home, in possession of marijuana. The officers placed him under arrest for possession of marijuana and transported him to the police station at about 8:00 p.m. During the investigation, the officers received information from multiple witnesses that Mr. Livermon was involved in the robbery of Ms. Coffman's home and that the SKS rifle belonged to him.

Beginning at 9:19 p.m., Detective A.R. Gordon of the South Charleston Police Department interrogated Mr. Livermon. The interrogation lasted for about an hour and 10 minutes. Before beginning the interrogation, Detective Gordon spent about six minutes advising Mr. Livermon of his *Miranda*[1] rights, and Mr. Livermon signed a waiver-of-rights form. The interrogation was audio recorded and focused primarily on the events surrounding the robbery of Ms. Coffman's home on August 8, 2013, not the marijuana possession. When Detective Gordon was asked during the April 17, 2014, suppression hearing why Mr. Livermon had not been charged with robbery or wanton endangerment, Detective Gordon explained, "Based on the statement that I had already obtained, I wanted to verify those statements . . . ." Mr. Livermon denied ownership of the SKS rifle and denied involvement in the robbery. Following the interrogation, Mr. Livermon was placed in a holding cell. The record reflects that a magistrate was on duty when Mr. Livermon was placed in the holding cell.

At approximately 1:05 a.m., about two and a half hours after being placed in the holding cell, Detective Ben Paschal executed a warrant to search Mr. Livermon's person for gunshot residue. He also conducted a second interrogation of Mr. Livermon. Detective Paschal began the second interrogation by reading Mr. Livermon his *Miranda* rights and having him sign a waiver-of-rights form. Again, this interview was recorded and focused primarily on the robbery on August 8, 2013. The interview lasted about an hour and twenty minutes. Near the end of the interrogation, Detective Paschal charged Mr. Livermon with robbery and wanton endangerment and walked him to the processing room. The transcript of the recorded interrogation ends as follows:

---

[1] The rights afforded a person in police custody by *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), are discussed *infra* Part II.A.

Unidentified: Let's take a little walk back here. [To the processing room.]

Q. [Detective Paschal] If you want to talk we will keep talking. (Inaudible) I still got that thing [the recording device] going, I don't want you to (inaudible)

. . . .

Q. I'm going to turn this thing off. You don't have anything you want to say anymore do you?

A. [Petitioner] Oh yeah.

Q. You got anything there. You got a video now. Is there anything else that you want to tell me right now that's (inaudible) What do you want to tell me?

A. Um---

Q. This is my boss Chief Detective Graley anything you tell me I'm going to tell him. So if there's something new you want to tell me now, tell me or I'll just turn it off. Are we done?

Unidentified: (inaudible)

Q. I think we're about done, he said he had something new to add but he's not saying so I'm turning it off. Man if you have something new to say now let's get it out let's get it done.

. . . .

A. (inaudible) I'm not going to sit here and say they did, he did, she did.

Q. If somebody uses your gun and does something (inaudible) it is what it is. I think I'm going off record here unless you got something to tell me. Tell me about it now and we'll talk about it. I know you keep looking at it because you don't want to do it on record. Is that what you want me to do you want me to turn it off?

A. I mean no, you probably, I mean yeah you can turn it off if you want to.

Q. Are you going to tell me anything? Do we turn this off?

A. Yeah.

Detective Paschal claimed that after he turned off the recording device, Mr. Livermon told him that he—Mr. Livermon—had stolen the rifle from the father of a girl named Breanna ("the unrecorded statement"). Detective Paschal noted that when Mr. Livermon made this statement, they were standing in the processing room which had signs indicating that the area was subjected to video and audio recording.

Mr. Livermon was indicted on October 24, 2013, on one count of first degree robbery, two counts of burglary, four counts of attempted murder, and five counts of wanton endangerment, all in connection with the events of August 8, 2013. Before trial, he filed a motion to suppress certain evidence, including the statements he made to police

3

after his arrest on grounds that his statements were taken in violation of *Miranda* and his prompt presentment right. After a pretrial hearing on the matter on April 17, 2014, the court denied the motion by an amended order entered on May 5, 2014.

With regard to Mr. Livermon's argument that his statements were taken in violation of *Miranda*, the circuit court determined that "[t]he defendant's recorded statements are admissible at trial under the 'totality of the circumstances' as he freely, voluntarily, intelligently, and knowingly waived his rights against self-incrimination in writing and on audio recordings." The court also decided that "[t]he police were not required to re-inform the defendant of his <u>Miranda</u> rights when they decided to charge him with the robbery and wanton endangerment because he was already under arrest and in custody for possession of marijuana."

With regard to Mr. Livermon's position that his prompt presentment right was violated, the circuit court made a finding that "[t]he detective's delay in immediately presenting the defendant before a magistrate on the night of August 9 was primarily investigatory in nature, and not solely an attempt to obtain a confession." The court concluded that "[t]he length of time the defendant was in custody before giving his statements does not offend the 'prompt presentment' rule under either Federal or State law. Any statement taken within six hours of arrest is considered not to violate the prompt presentment rule."

Mr. Livermon received a jury trial. During the trial, Mr. Washington testified that shortly before the robbery of Ms. Coffman's home, he declined Mr. Livermon's request to join him in a robbery. Ms. Lowry similarly testified that Mr. Livermon informed her of his intent to commit a robbery on the same day as the robbery. Mr. Washington, Ms. Lowry, and a friend of Mr. Washington all testified that after the robbery, Mr. Livermon returned to the Washington home claiming he had committed a robbery. Ms. Lowry further testified that the rifle recovered from the home belonged to Mr. Livermon and that she had advised him to "get it out of the house" because "it was hot."[2] Detective Paschal testified that during the second interrogation of Mr. Livermon, Mr. Livermon admitted that "he had stolen the gun," referring to the SKS rifle found in the Washington home.

On May 9, 2014, the jury trial culminated in a conviction on one count of first degree robbery and five counts of wanton endangerment. The circuit court entered a verdict order on May 19, 2014, remanding Mr. Livermon to the South Central Regional Jail until sentencing. On July 24, 2014, Mr. Livermon was sentenced to ten years for the first degree robbery conviction and a determinate term of five years for each count of wanton endangerment, with each of the sentences running consecutively.

---

[2] "Hot" is a slang word for "stolen." *See State v. Wallace*, 118 W. Va. 127, 131, 189 S.E.104, 106 (1936) ("[H]e told defendant that the ring was " hot," meaning that it was stolen property . . . .").

4

**II. Analysis**

Mr. Livermon appeals his conviction, arguing that the circuit court committed reversible error by failing to suppress the unrecorded statement he made to Detective Paschal—a statement he deems a confession. He asserts that the statement should have been suppressed because it was obtained in violation of *Miranda* and his prompt presentment right. We have held that when reviewing a circuit court's decision on a motion to suppress, we will construe the facts in a light most favorable to the State, and we will review the circuit court's findings of fact for clear error. *See* syl. pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996) ("When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.").

**A. *Miranda***

Mr. Livermon contends that warnings he received before he gave the unrecorded statement did not comply with *Miranda* because he was not informed that he had the right to terminate the interrogation at any time. *Miranda* requires that for the State to use a statement acquired during custodial interrogation, "it [must] demonstrate[] the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The procedural safeguards envisioned by *Miranda* require that a person in custody

> be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.*; *accord* syl. pt. 7, *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971), *overruled on other grounds by State ex rel. White v. Mohn*, 168 W. Va. 211, 283 S.E.2d 914 (1981). The United States Supreme Court, in deciding *Miranda*, did not require that those in police custody be informed of the right to terminate interrogation at any time—sometimes referred to as the "fifth *Miranda* warning." *See* Scott Lewis, *Miranda Out On a Limb: How Much Flexibility Before Rules Are Broken?*, 9-FALL Crim. Just. 20 (1994). While this Court has recognized that *Miranda* permits a person in police custody to terminate an interrogation, *see* syl. pt. 5, *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994) (discussing a person's right "to assert the *Miranda* right to terminate police interrogation"), like the U.S. Supreme Court we have not required an admonition to that effect. Thus, the *Miranda* warning given to Mr. Livermon prior to the unrecorded statement complied with *Miranda* and was not defective.

5

Mr. Livermon further argues that Detective Paschal's offer to go "off the record" undermined the waiver of his *Miranda* rights. *See, e.g., Lee v. State*, 12 A.3d 1238, 1247–48 (Md. 2011) (providing that "[a]fter proper warnings and a knowing intelligent, and voluntary waiver, the interrogator may not say or do something during the ensuing interrogation that subverts those warnings and thereby vitiates the suspect's earlier waiver by rendering it unknowing, involuntary, or both."). This Court has said that "[a]bsent a knowing and intelligent waiver of the Fifth Amendment right against self-incrimination, a statement made by a suspect during in-custody interrogation is inadmissible." *State v. Bradshaw*, 193 W. Va. 519, 527, 457 S.E.2d 456, 464 (1995) (citing *Miranda*, 384 U.S. at 475).

Under the circumstances in this case, we conclude that Mr. Livermon could not have reasonably believed that anything he said while the detective's recording device was turned off could not later be used against him. Detective Paschal made no promises to Mr. Livermon that any statement given while the recording device was turned off would remain between the two of them. *See Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (officer's assurance that defendant's statement would be "for me and you" and that it would not be "for nobody else" vitiated the defendant's prior waiver of his *Miranda* rights); *Spence v. State*, 642 S.E.2d 856, 858 (Ga. 2007) (officer's assurance that the defendant's statement would be "confidential" vitiated the defendant's prior waiver of his *Miranda* rights). To the contrary, Detective Paschal informed Mr. Livermon that anything he said would be reported to Detective Graley. Further, Detective Paschal testified during the April 17, 2014, suppression hearing that Mr. Livermon made the unrecorded statement in a room containing prominent signage indicating that the room was under video and audio surveillance. While Detective Paschal offered to turn off his personal recording device, he made no representations that he would also turn off the audio and video recorders in the processing area or that anything recorded could not and would not be used against him.[3] Under the specific facts of this case, we conclude that Detective Paschal's "off the record" comment did not undermine Mr. Livermon's prior decision to waive his *Miranda* rights.

Mr. Livermon also asserts that his waiver of his *Miranda* rights was not voluntary because (1) he did not know the nature of the charges against him when the *Miranda* warnings were given, (2) because he did not receive *Miranda* warnings after he was informed that he was being charged with robbery and wanton endangerment, and (3) because Detective Paschal led him to believe that the unrecorded statement would not be used against him. He states that when he was given the *Miranda* warnings, he had been arrested for possession of marijuana, that the *Miranda* wavier form only listed possession

---

[3] Detective Paschal testified during the April 17, 2014, suppression hearing that because of a problem with the audio recording equipment in the processing room, Mr. Livermon's statement was not recorded.

6

of marijuana as the crime with which he had been charged, that he was under the impression that his statements could only be used against him in relation to the marijuana charge, and that the unrecorded statement would be "off the record" and not used against him in the future.

In support of his position that the unrecorded statement was made following an involuntary waiver of his rights, Mr. Livermon directs us to *State v. Goff*, 169 W. Va. 778, 289 S.E.2d 473 (1982), in which we said:

> Some courts have indicated that in determining whether there has been a voluntary waiver of *Miranda* rights under the totality rule one factor may be whether the defendant was ever advised initially of the nature of the charge against him. Other courts have reached an opposite conclusion that there is no necessity of informing the defendant of the nature of the charge prior to giving the *Miranda* warnings. We believe that some information should be given to the defendant as to the nature of the charge in order that he can determine whether to intelligently and voluntarily exercise or waive his *Miranda* rights.

*Id.* at 784 n.8, 289 S.E.2d at 477 n.8 (citations omitted).

We also observe that "[a] criminal suspect who knowingly and voluntarily waives his Miranda rights need not be re-advised of those rights during subsequent interrogations, so long as the initial waiver retains its efficacy." *State v. DeWeese*, 213 W. Va. 339, 350, 582 S.E.2d 786, 797 (2003) (quoting *Yung v. State*, 906 P.2d 1028, 1033 (Wyo. 1995)). In determining whether an initial waiver retains its efficacy, courts should consider

> (1) the length of time between the giving of the first warnings and subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the subsequent statement differed from any previous statements; and (5) the apparent intellectual and emotional state of the suspect.

Syl. pt. 5, *id.* (in part).

We further note that the Court has held, "Misrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession unless they are shown to have affected its voluntariness or reliability." Syl. pt. 6, *State v. Worley*, 179 W. Va. 403, 369 S.E.2d 706 (1988); *see also* syl. *State v. Parsons*, 108 W. Va. 705, 152 S.E. 745 (1930) ("When the representations of one in authority are

calculated to foment hope or despair in the mind of the accused to any material degree, and a confession ensues, it cannot be deemed voluntary."). Voluntariness is judged under the totality of the circumstances. *See Bradshaw*, 193 W. Va. at 527, 457 S.E.2d at 464.

We acknowledge that when both of the interrogations of Mr. Livermon began, he had only been officially charged with possession of marijuana. However, Detective Gordon testified during the April 17, 2014, pretrial hearing, "I informed him during the [first interrogation] that I had already obtained two statements who stated that he was involved with [the robbery], that he owned the firearm or possessed the firearm that was used in that robbery." Moreover, Mr. Livermon admits in his brief that "the bulk of the [first interrogation] centered on the robbery and shooting that had occurred." Under these facts, it is clear that when Mr. Livermon voluntarily waived his *Miranda* rights at the outset of the second interrogation, he was aware that he was under investigation for the events surrounding the robbery of Ms. Coffman and Mr. Rencher.

Additionally, the facts of the case show that the *Miranda* warning remained effective through Mr. Livermon's unrecorded statement. The length of time between receiving the latest *Miranda* warning and the unrecorded statement was minimal—less than two hours; the warning was given and the interrogation conducted by Detective Paschal; the unrecorded statement did not differ substantially from the recorded portion of the statement in which Mr. Livermon admitted to taking an SKS rifle belonging to the father of Breanna; and neither the State nor Mr. Livermon alleges that he was intellectually or emotionally compromised at the time he made the unrecorded statement.

Finally, the record reflects that Detective Paschal did not deceive Mr. Livermon regarding the confidentiality of statements made while the detective's recording device was turned off. Even if he had, there is no evidence and no allegation that Mr. Livermon's will was overborn, causing Mr. Livermon to make the unrecorded statement. *See Lee*, 12 A.3d at 1253 ("As we have said, a mere promise, whether it be of leniency or, as here, confidentiality, without more, will not render a confession involuntary, for federal (or state) constitutional purposes.").

Under the totality of the circumstances, we conclude that Mr. Livermon's unrecorded statement was not the result of an involuntary waiver of his *Miranda* rights. He executed a valid waiver of his *Miranda* rights, the waiver of his rights at the commencement of the second interrogation remained valid and effective through giving the unrecorded statement, and Detective Paschal's assertion did not coerce Mr. Livermon into in giving the statement.

### B. Prompt Presentment

Mr. Livermon claims that the unrecorded statement was obtained in violation of his prompt presentment right. West Virginia's prompt presentment rule is set forth in W. Va. Code § 62-1-5(a)(1) (1997) as follows:

An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence or as otherwise authorized by law, shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made.

*Accord* W. Va. R. Crim. P. 5(a). "[O]ne of the primary purposes of a prompt presentment statute is to ensure that the police do not use the delay to extract a confession from a defendant." *State v. Hutcheson*, 177 W. Va. 391, 394, 352 S.E.2d 143, 146 (1986). "[A]n unjustifiable and unreasonable delay in taking the accused before a magistrate after his initial arrest may in itself be sufficient to render a confession involuntary." *State v. Persinger*, 169 W. Va. 121, 137–38, 286 S.E.2d 261, 271 (1982). Necessary delays do not render a confession involuntary.

Examples of necessary delay might include those required: 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime.

*Persinger*, 169 W. Va. at 135–36, 457 S.E.2d at 270 (quoting *Johnson v. State*, 384 A.2d 709, 717 (Md. 1978)). However, "[t]he delay in taking the defendant to a magistrate may be a critical factor where it appears that the primary purpose of the delay was to obtain a confession from the defendant." Syl. pt. 6, *Persinger*, 169 W. Va. 121, 286 S.E.2d 261. "When a statement is obtained from an accused in violation of the prompt presentment rule, neither the statement nor matters learned directly from the statement may be introduced against the accused at trial." Syl. pt. 1, *DeWeese*, 213 W. Va. 339, 582 S.E.2d 786.

In analyzing whether Mr. Livermon's prompt presentment right was violated, we find *State v. Mitter*, 169 W. Va. 652, 289 S.E.2d 457 (1982), instructive. In *Mitter*, in the course of a murder investigation, police officers asked the defendant to come to the prosecutor's office for questioning. *Id.* at 653, 289 S.E.2d at 459. The defendant arrived at about 1:00 p.m. and was interviewed by police officers. *Id.* During this interview, the defendant made a confession. *Id.* At 3:00 p.m., the defendant signed a written waiver of rights form, and deputies proceeded to transcribe the confession, ending the interview at

4:30 p.m. *Id.* at 654, 289 S.E.2d at 459. The officers then left the defendant in the interrogation room and joined the prosecutor in discussing the discrepancies between the defendant's statement and what they knew about the crime. *Id.* The officers returned to the interrogation room and took a second written confession from the defendant, beginning at 5:40 p.m. *Id.* at 655, 289 S.E.2d at 460. One officer stated that the purpose of the second interview as "[j]ust to clear up a few discrepancies." *Id.* at 659, 289 S.E.2d at 462. The second confession was completed at 6:40 p.m. *Id.* at 655, 289 S.E.2d at 460. Thereafter, the defendant was formally arrested and arraigned before a magistrate. *Id.*

On appeal, the defendant in *Mitter* argued that his confessions were taken in violation of his prompt presentment right and were involuntary. *Id.* at 657, 289 S.E.2d at 461. The Court decided that the trial judge erred by admitting the second confession into evidence, reversing the case on that issue. *Id.* With regard to the first confession, the Court reasoned that at the time the defendant began the first confession, the officers did not have probable cause to arrest him, and that delay after they obtained probable cause was not "unnecessary" within the meaning of the prompt presentment rule because "[t]he purpose of that delay was not to obtain the confession but to transcribe it." *Id.* at 658, 289 S.E.2d at 461. However, with regard to the second confession, the Court said:

> By seeking a second confession to "clear up a few discrepancies" the police were actually holding the defendant for the explicit purpose of rendering a usable confession from him. A magistrate was available at the time and had been alerted that his services would be required. Under these facts the delay in taking the defendant before a magistrate after the first confession was so unjustifiable and unreasonable as to render the second written statement inadmissible.

*Id.* at 659, 289 S.E.2d at 462.

Mr. Livermon's second interrogation bears a striking resemblance to the second interview of the defendant in *Mitter*. Like in *Mitter*, by the end of the first interrogation, the prompt presentment rule had been triggered by, in Mr. Livermon's case, his arrest for possession of marijuana. Like the defendant in *Mitter*, Mr. Livermon was held following the first interrogation while the officers conducted further investigation despite a magistrate's availability. Both the *Mitter* defendant and Mr. Livermon were then interrogated a second time. It is obvious to us, as it was obvious in *Mitter*, that the only purpose of conducting a second interrogation following "investigation" was to obtain an inculpatory statement from Mr. Livermon. Under these facts, we conclude that Mr. Livermon's prompt presentment right was violated, and that the trial court erred by permitting the State to admit Mr. Livermon's unrecorded statement.

The State contends that any error in this case is not reversible, questioning whether the unrecorded statement is even inculpatory. Presuming that the statement is inculpatory,

10

we agree with the State's position that the admission of the unrecorded statement was entirely harmless. We have held that

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Syl. pt. 2, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979). Here, removal of the unrecorded statement from the case would have had no effect on the jury's verdict because evidence that the rifle was in Mr. Livermon's possession and that it was stolen was presented through the testimony of Ms. Lowry without objection by defense counsel. The unrecorded statement was short and duplicative of other evidence, and in light of the substantial weight of the other evidence admitted during Mr. Livermon's trial, including the testimony of others, we conclude that the admission of the unrecorded statement could not have had any prejudicial effect on the jury.[4]

Finding no reversible error in this case, we affirm the circuit court's May 19, 2014, order convicting Mr. Livermon of one count of first degree robbery and five counts of wanton endangerment.

Affirmed.

**ISSUED: November 15, 2016**

**CONCURRED IN BY:**
Chief Justice Menis E. Ketchum
Justice Robin Jean Davis
Justice Brent D. Benjamin

---

[4] To the extent that we found only one harmless error in this case, there is no merit to Mr. Livermon's argument that the case contains reversible cumulative error.

11

**CONCURRING, IN PART, AND DISSENTING, IN PART:**

Justice Margaret L. Workman

**CONCURRING, IN PART, AND DISSENTING, IN PART, AND WRITING SEPARATELY:**

Justice Allen H. Loughry II

Justice Allen H. Loughry II, concurring, in part, and dissenting, in part, and writing separately:

When a court is presented with a prompt presentment challenge, "the focus is not so much on the length of the detention but whether the police were primarily using the delay in bringing the defendant before a magistrate to obtain a confession from him." *State v. Persinger,* 169 W.Va. 121, 136, 286 S.E.2d 261, 270 (1982).

Following the petitioner's arrest for marijuana possession, he was retained at police headquarters for approximately six hours during which time administrative matters were addressed, a search warrant was obtained, and the petitioner gave two voluntary *Mirandized* statements regarding other crimes being actively investigated. Although the petitioner never confessed to any crime for which he was arrested or charged, the delay in presenting him to a magistrate was clearly not for the primary purpose of securing a confession nor was it unnecessary. *See* Syl. Pt. 1, *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984) (citation omitted) ("'The delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissible] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.'"). Consequently, although I concur in the majority's decision to uphold the petitioner's conviction, I dissent to its conclusion that there was a prompt presentment violation, albeit harmless error.

Briefly, the facts demonstrate that during the police investigation of a robbery and wanton endangerment, a search warrant was executed on an apartment where police discovered a rifle believed to have been used to commit those crimes. Three persons were in the apartment at that time, including the petitioner. The petitioner was arrested for marijuana possession and transported to the police department, arriving at approximately 8:00 p.m. At 9:19 p.m., a detective advised the petitioner of his *Miranda* rights, which the petitioner agreed to waive and give a statement. Suppression hearing testimony reveals that the detective advised the petitioner that he was a suspect in the robbery and wanton endangerment, and his questions were directed toward those crimes. Once the interview concluded at approximately 10:30 p.m., the petitioner was placed in a

holding cell during which time the detective took the steps necessary to secure a search warrant to obtain a gunshot residue sample from the petitioner. The detective executed the search warrant on the petitioner around 1:05 a.m., and again advised him of his *Miranda* rights. The petitioner agreed to waive those rights and to give a second statement, during which questioning regarding the robbery and wanton endangerment resumed. At the conclusion of his second statement, the petitioner was advised that he was being charged with those other crimes. As he was being escorted to processing, the petitioner made an unrecorded statement that he had stolen the rifle that had been removed from the apartment when officers executed the search warrant.

The manner in which the petitioner was questioned is somewhat similar to *State v. Milburn*, 204 W.Va. 203, 511 S.E.2d 838 (1998), where the defendant was detained and questioned regarding a different crime. In *Milburn*, the defendant was *Mirandized* and signed a waiver of rights form, after which she was questioned by the police. She confessed to arson around 11:00 a.m. Thereafter, the police advised the defendant that they wanted to question her regarding a murder, and she agreed to answer questions. Around 7:30 p.m., she confessed to the murder, as well. Seeking to suppress her confession, the defendant alleged the police had probable cause to arrest her on the arson charge at noon but, instead of presenting her to a magistrate, they continued to question her, eventually eliciting her murder confession. This Court concluded:

> Based upon the totality of the circumstances, we cannot conclude that [the] prompt presentment rule was violated. The purpose of the delay in arresting the appellant and presenting her to a magistrate was not to obtain a confession for the crime for which the police had probable cause to arrest, i.e., the arson. Instead, the police sought to question the appellant at that time about a separate crime for which they had no probable cause to arrest.

*Id.*, 204 W.Va. at 212, 511 S.E.2d at 837. As in *Milburn*, the purpose in the delay was not to obtain a confession from the petitioner for marijuana possession. Instead, the police sought to question him at that time regarding the robbery and wanton endangerment for which the police had no probable cause to arrest.

Certainly, an officer must "take the arrested person without *unnecessary* delay before a magistrate of the county where the arrest is made." W.Va. Code § 62-1-5(a)(1) (2014) (emphasis added). If there is unnecessary delay during which a confession is obtained, a defendant may seek to suppress the confession alleging a violation of the requirement for prompt presentment. Significantly, however, the petitioner never confessed to either the crime for which he was arrested–marijuana possession–nor for the crime for which he was ultimately charged and convicted—robbery and wanton endangerment. Indeed, during the detective's questions, the petitioner never admitted to ever having fired any gun, let alone the rifle he admitted to stealing. Moreover, it does

13

not appear that the petitioner was ever charged with the theft of the rifle. Critically, absent such a confession, there is simply no prompt presentment violation.

Even if the petitioner's statement that he had stolen the rifle could be transmuted into a confession to having committed robbery and wanton endangerment, as indicated above, not all delays vitiate a confession—only those that are *unnecessary*. *See* W.Va. Code § 62-1-5(a)(1). By way of example, this Court has explained that

> "necessary delay might include those required: 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime."

*Persinger*, 169 W.Va. at 135-36, 286 S.E.2d at 270 (citation omitted); *see also State v. Sugg*, 193 W.Va. 388, 395-96, 456 S.E.2d 469, 476-77 (1995) (footnote omitted) ("Certain delays such as delays in the transportation of a defendant to the police station, completion of booking and administrative procedures, recordation and transcription of a statement, and the transportation of a defendant to the magistrate do not offend the prompt presentment requirement."). Certainly, another example of a necessary delay is the time it takes to secure a search warrant to obtain a gunshot residue sample.

Based on the foregoing and under the totality of the circumstances, I do not believe there has been a prompt presentment violation in this matter. Accordingly, I respectfully concur, in part, and dissent, in part. I am authorized to state that Justice Workman joins me in this concurrence and dissent.

14